KAREN L. MANKER, APPELLEE, V.
JAMES I. MANKER, APPELLANT.
644 N.W.2d 522

Filed May 24, 2002.   No. S-01-736.

Thomas Blount, of Bertolini, Schroeder & Blount, for appellant.

Daylene A. Bennett, of Burger & Bennett, P.C., for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

PER CURIAM.

## I. NATURE OF CASE

Karen L. Manker and James I. Manker were married in 1979 and lived together until 1998. On August 13, 1999, Karen filed this action alleging she had learned for the first time in 1994 that James had dissolved the marriage in 1980. In her petition, Karen claimed she was a putative spouse within the meaning of Neb. Rev. Stat. § 42-378 (Reissue 1998) and sought relief in the form of an equitable division of assets, alimony, and child support. In the alternative, Karen requested that she be granted the same relief through the imposition of a constructive trust. James asserted various defenses, including an allegation that Karen's

claims were barred by the statute of limitations. The district court entered an order rejecting James' defenses and awarding Karen her requested relief. James perfected this timely appeal, and we granted his petition to bypass.

## II. BACKGROUND

The parties were married in Kearney, Nebraska, on September 4, 1979. On February 21, 1980, James filed a petition in the district court for Buffalo County seeking to dissolve the marriage. Karen signed a voluntary appearance at the office of James' attorney on March 5. On April 18, Karen again accompanied James to his attorney's office to sign a property settlement agreement.

Notice of the final hearing on James' petition for dissolution was mailed to Karen at her address in Kearney on or about April 24, 1980. On May 8, James and his counsel appeared at the final hearing, but Karen did not appear personally or through counsel. The district court ordered the marriage dissolved after finding it to be irretrievably broken and then accepted the parties' property settlement agreement and incorporated it in the decree. On May 9, the clerk of the district court for Buffalo County mailed notice of the judgment to Karen at the address in Kearney where she and James resided.

Notwithstanding the legal dissolution of their marriage, James and Karen continued to reside together and hold themselves out as husband and wife. In late June or early July 1980, the couple moved to Loup City, Nebraska, so James could take a job as an industrial arts teacher. When James began his employment, he listed Karen as his "spouse" on his health insurance forms. James purchased a house in Loup City, and the warranty deed to the home referred to James and Karen as "husband and wife." In 1980, the parties filed their state and federal income tax returns under the status "Married, filing joint return" and continued to do so until 1997.

In 1988, the couple sold the house in Loup City and moved to Wauneta, Nebraska, so James could take a position as a school principal. When James began this employment, he again listed Karen as his "spouse" on his health insurance forms. In 1992, the parties visited an attorney for the purpose of executing wills. James executed a will that referred to Karen as his "wife" and left

Karen the entirety of his property in the event of his death. Karen executed a will that referred to James as her "husband" and left the entirety of her property to James in the event of her death.

In 1998, the parties' relationship ended, and James moved out of the rented home in which the family had resided. On August 13, 1999, Karen filed this action in the district court for Chase County. In her petition, Karen alleged that she was "completely and innocently ignorant of the actual status of her marriage until the fall of 1994." Karen prayed that the district court declare her to be James' putative spouse under § 42-378 and equitably distribute the assets accumulated by the parties during the alleged putative marriage or, in the alternative, for the imposition of a constructive trust. She further prayed for a determination that James is the father of a child born October 10, 1983, during their cohabitation, an award of legal custody of the child, and an award of child support.

After his general demurrer was overruled, James filed an answer in which he affirmatively stated that he has "always acknowledged [the child] to be his son and has supported him since the date of his birth." He further alleged that Karen "was well aware that the parties were divorced in 1980," that her petition failed to state facts sufficient to state a cause of action, and that her purported cause of action was barred by the statute of limitations and laches.

At trial, Karen admitted executing the voluntary appearance and property settlement agreement in 1980 but claimed that James subsequently told her that "he was just thinking about" a divorce and that "[h]e had time to stop it." Karen further testified that sometime between April and June 1980, James informed her that he had, in fact, dismissed the divorce proceedings on the day after the parties signed the property settlement agreement.

Karen denied ever receiving a copy of the notice of the final hearing on James' petition for dissolution or the notice of final judgment. She testified that James always retrieved the mail and surmised that he must have concealed these documents from her. Karen testified that at the time, she did not check with the court or James' attorney to verify that the dissolution proceeding had been dismissed. Karen stated that she simply "believed [James]" in this regard.

Karen testified that she had no reason to suspect her marriage to James had been dissolved until James made a suspicious comment during an argument in 1994. Based on this comment, Karen consulted an attorney who made inquiries and confirmed that the decree had, in fact, been entered in 1980. Karen testified that she was "shocked" to learn of this fact.

On direct examination, Karen was questioned about why she had continued living with James after discovering in 1994 that the marriage had been dissolved. She stated that she attempted to move out on one occasion in 1994 but that James said he would move out instead. According to Karen, James did not move out until 1998, despite her repeated requests that he do so. Asked why she did not disclose the dissolution to others after learning of it in 1994, Karen testified that James told her they "couldn't do that . . . because . . . it would alert the IRS and we'd be into a lot of trouble. And he'd lose his job."

Additional testimony from both parties established that James handled all of the couple's finances and that nearly all of the property accumulated during their relationship was titled in James' name. As of 1997, the only property held by Karen was $800 deposited in a checking account, an IRA worth $16,501.55 that Karen cashed for living expenses following the separation, a savings bond valued at $5,542 which was given to Karen by James' father and subsequently cashed by Karen, and a 1997 Buick LeSabre automobile purchased by James but titled in Karen's name. The remainder of the property, including James' substantial retirement account, numerous stocks and bonds, a pickup, a boat, and a camper, was all titled in James' name. James testified that he purchased all of these assets with his own funds.

In an order entered June 12, 2001, the district court stated:

> The Court finds that the very difficult issue in this case is the credibility of the parties. The question comes down to who does the Court believe. The Court finds that based upon the testimony, the demeanor of the witnesses, particularly Karen and James and the facts surrounding the dissolution of marriage in 1980 and the actions of the parties since 1980, [that] the plaintiff herein presented the more credible evidence. The Court finds specifically that the plaintiff herein believed, in good faith, that the defendant

had stopped the dissolution of marriage in 1980 and that she was married to the defendant in 1980 and remained married to the defendant up until 1994. The Court further finds that in the fall of 1994, Karen found out the truth and [sic] that she had, in fact, been divorced from James since May 8, 1980.

Based upon these findings, the district court concluded that Karen should be considered James' putative spouse pursuant to § 42-378.

In reaching its conclusion, the district court relied on the decision of the California Court of Appeals in *In re Marriage of Monti*, 135 Cal. App. 3d 50, 185 Cal. Rptr. 72 (1982), which held that a person who continues to live with a former spouse in ignorance of a final dissolution decree and with a good faith belief in the continued validity of the marriage is a putative spouse under California law. The district court reasoned that because the California putative spouse statute construed in *In re Marriage of Monti* was similar to § 42-378, the same result was warranted in this case.

The district court acknowledged that more than 4 years had elapsed between the date in 1994 when Karen discovered that the marriage had been dissolved and the filing of her petition on August 13, 1999. Nevertheless, the district court reasoned that because the parties had lived together until the fall of 1998 and because of certain statements James had made to Karen after 1994, her claim was not time barred. Based upon its determination that Karen was a putative spouse and its alternative determination that Karen was entitled to relief through the imposition of a constructive trust, the district court divided the parties' assets and ordered James to "transfer to Karen . . . accounts, money, or monies worth [or] valued at one hundred thirty-eight thousand five hundred twenty-seven dollars ($138,527.00)," as part of a "property settlement." The district court then entered a judgment in that amount, with interest from and after June 1, 2001, until paid in full.

The district court also ordered Karen and James to execute a qualified domestic relations order and any other documents necessary to accomplish a division of James' interest in a teacher retirement program. In addition, the court found that James had

acknowledged paternity of the parties' minor child and ordered that custody of the child be awarded to Karen, subject to James' right of reasonable visitation, and that James pay $958 per month in child support to Karen commencing June 1, 2001, and continuing until the child reaches the age of majority, dies, or becomes emancipated. Finally, the court ordered James to pay alimony in the amount of $700 per month for 60 months commencing July 1, 2001, and terminating on the death or remarriage of Karen.

## III. ASSIGNMENTS OF ERROR

James assigns, restated and consolidated, that the district court erred (1) in concluding that Karen was a putative spouse within the meaning of § 42-378; (2) in finding that Karen held a good faith belief in the existence of her marriage until 1994; (3) in concluding that Karen could, in the alternative, be compensated through the imposition of a constructive trust; (4) in concluding that Karen's cause of action under § 42-378, her action for the imposition of a constructive trust, and her actions for paternity and child support were all not barred by their applicable statutes of limitations; (5) in dividing James' property and awarding it to Karen; and (6) in awarding Karen alimony.

## IV. STANDARD OF REVIEW

■ On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *Ruzicka v. Ruzicka*, 262 Neb. 824, 635 N.W.2d 528 (2001); *In re Estate of Mecello*, 262 Neb. 493, 633 N.W.2d 892 (2001).

■ Statutory interpretation presents a question of law. *Sydow v. City of Grand Island, ante* p. 389, 639 N.W.2d 913 (2002); *In re Interest of Sabrina K.*, 262 Neb. 871, 635 N.W.2d 727 (2001).

■ The determination of which statute of limitations applies is a question of law. *Blankenau v. Landess*, 261 Neb. 906, 626 N.W.2d 588 (2001); *Adkins v. Burlington Northern Santa Fe RR. Co.*, 260 Neb. 156, 615 N.W.2d 469 (2000). The point at which a statute of limitations begins to run must be determined from the facts of each case, and the decision of the district court on the issue of the statute of limitations normally will not be set aside by an appellate court unless clearly wrong.

*Blankenau v. Landess, supra*; *Nebraska Popcorn v. Wing*, 258 Neb. 60, 602 N.W.2d 18 (1999).

## V. ANALYSIS

The relief awarded by the district court falls into two distinct categories. The first involves the court's finding that James was the father of the parties' minor child. Based upon this determination of paternity, the district court awarded custody to Karen subject to James' reasonable rights of visitation and ordered James to pay child support. The second category of relief relates to the court's finding that Karen was entitled to an equitable division of property and alimony under either of her alternative theories of relief. Because these two categories of relief are not interdependent, we analyze them separately.

### 1. PATERNITY, CUSTODY, VISITATION, AND CHILD SUPPORT

The only assignment of error directed toward the determination of paternity and the award of custody and child support is James' assertion that these claims are barred by the statute of limitations. The procedure for obtaining a judicial determination of paternity is set forth in Neb. Rev. Stat. §§ 43-1401 to 43-1418 (Reissue 1998 & Cum. Supp. 2000). Section 43-1411 provides that a paternity action may be instituted "by (1) the mother or the alleged father of such child, either during pregnancy or within four years after the child's birth . . . or (2) the guardian or next friend of such child or the state, either during pregnancy or within eighteen years after the child's birth." James argues that the paternity action was initiated by the mother more than 4 years after the child's birth and is now time barred.

The statute of limitations is an affirmative defense which is waived if not asserted by demurrer or answer. *Welsch v. Graves*, 255 Neb. 62, 582 N.W.2d 312 (1998). In his answer, James alleged generally that "the Plaintiff's Petition fails to state facts upon which a cause of action may be maintained by her and, further, that any action otherwise maintainable by her is barred by the Statute of Limitations." However, this assertion was preceded in the answer by a specific affirmative allegation that James "has always acknowledged [the minor child] to be his son and has supported him since the date of his birth." James' general statute of limitations allegation is inconsistent with his specific allegation

that he has always acknowledged paternity and his obligation to support the minor child. Where both general and specific allegations are made in a pleading with respect to the same matter, the latter controls. *Sickler v. City of Broken Bow*, 143 Neb. 542, 10 N.W.2d 462 (1943). Moreover, James' affirmative allegation that he had acknowledged paternity and the corresponding obligation of parental support prior to the filing of this action is a judicial admission which constitutes a waiver of all controversy with respect to those issues. *Radecki v. Mutual of Omaha Ins. Co.*, 255 Neb. 224, 583 N.W.2d 320 (1998). Accordingly, there is no merit to James' contention that the district court erred in not determining these claims to be time barred.

### 2. Division of Property and Alimony

Karen also sought an equitable division of the property acquired during the period of cohabitation and an award of alimony on the theory that she was a putative spouse under § 42-378 or the alternative theory that James had committed fraud warranting the imposition of a constructive trust on the assets. James denied the material allegations pertaining to these claims and asserted a statute of limitations defense. The district court determined that Karen was entitled to relief under either of her theories of recovery and held that the claims were not time barred.

### (a) Putative Spouse Doctrine—§ 42-378

In his second assignment of error, James contends the district court erred in determining Karen was a putative spouse within the meaning of § 42-378. The specific issue presented is whether the statute applies in the circumstance of a party who continues to live with an ex-spouse in good faith ignorance of the fact that their once-valid marriage has been dissolved. We have not previously had an opportunity to address this issue, but we do so now guided by the familiar principle that in the absence of anything to the contrary, statutory language is to be given its plain and ordinary meaning; an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. *Philpot v. Aguglia*, 259 Neb. 573, 611 N.W.2d 93 (2000); *Ferguson v. Union Pacific RR. Co.*, 258 Neb. 78, 601 N.W.2d 907 (1999).

Section 42-378 provides:

When the court finds that a party entered into the contract of marriage in good faith supposing the other to be capable of contracting, and the marriage is declared a nullity, such fact shall be entered in the decree and the court may order such innocent party compensated as in the case of dissolution of marriage, including an award for costs and attorney fees.

A "nullity" is "[s]omething that is legally void." Black's Law Dictionary 1095 (7th ed. 1999). "Nullity of marriage" refers to "[t]he invalidity of a presumed or supposed marriage because it is void on its face or has been voided by court order." *Id.* at 1096. The marriage in this case was never void; it was legally valid from its inception in 1979 until its dissolution in 1980.

In determining that § 42-378 applied in this case notwithstanding the fact that the marriage was never declared a nullity, the district court relied on *In re Marriage of Monti*, 135 Cal. App. 3d 50, 185 Cal. Rptr. 72 (1982). In *In re Marriage of Monti*, the California Court of Appeals applied California's putative spouse statute in a circumstance where the parties were both lawfully married and then lawfully divorced, but the woman continued living with the man based upon his representation that the divorce was never finalized. The relevant California statute provided: " 'Whenever a determination is made that a marriage is void or voidable and the Court finds that either party or both parties believed in good faith that the marriage was valid, the Court shall declare such party or parties to have the status of a putative spouse . . . .' " *In re Marriage of Monti*, 135 Cal. App. 3d at 52 n.1, 185 Cal. Rptr. at 73 n.1. The court noted that this statute codified but did not change the substantive common law which existed prior to its enactment. Although the court acknowledged that under California common law, the putative spouse principle "is usually applied in situations where a ceremonial marriage becomes void or voidable," it cited two cases decided prior to the enactment of the statute in which a person who continued to live with a former spouse in good faith ignorance of a divorce was deemed to be a putative spouse. *Id.* at 55, 185 Cal. Rptr. at 74, citing *Lazzarevich v. Lazzarevich*, 88 Cal. App. 2d 708, 200 P.2d 49 (1948), and *Feig v. Bank of Italy etc. Assn.*, 218 Cal. 54, 21 P.2d 421 (1933). On the

basis of this preexisting common law, the *In re Marriage of Monti* court concluded that the statute "must be interpreted to include as a putative spouse a divorced spouse who continues to live with the ex-spouse in ignorance of the final divorce decree and with a good faith belief in the continuing validity of the marriage." 135 Cal. App. 3d at 56, 185 Cal. Rptr. at 75.

Section 42-378 was enacted in 1972. 1972 Neb. Laws, L.B. 820, § 32. Neither the briefs of the parties nor our own research has disclosed any opinion of this court applying the putative spouse doctrine prior to the enactment of the statute. Thus, the common-law predicate upon which the *In re Marriage of Monti* court relied in interpreting the California statute does not exist in this state. This court's discussion of § 42-378 since its enactment has always been in the context of void or voidable marriages. For example, in *Randall v. Randall*, 216 Neb. 541, 345 N.W.2d 319 (1984), we concluded that a woman could not be considered a putative spouse under § 42-378 because the evidence established that she had always known that the parties' civil and religious marriage ceremonies performed in Mexico were invalid. Also, in *Hicklin v. Hicklin*, 244 Neb. 895, 509 N.W.2d 627 (1994), we noted that § 42-378 was properly applied to a woman whose marriage was void because she married a man whose divorce was not yet final.

A plausible argument can be made that putative spouse principles should be applied in the circumstance where one lives with a former spouse in the good faith belief that their valid marriage has not been dissolved and, indeed, some statutes do so provide. For example, the Uniform Marriage and Divorce Act provides:

> Any person who has cohabited with another to whom he is not legally married in the good faith belief that he was married to that person is a putative spouse until knowledge of the fact that he is not legally married terminates his status and prevents acquisition of further rights.

Unif. Marriage and Divorce Act § 209, 9A U.L.A. 192 (1998). See, also, Colo. Rev. Stat. Ann. § 14-2-111 (West 1997); 750 Ill. Comp. Stat. Ann. 5/305 (Lexis 1999); Minn. Stat. Ann. § 518.055 (West 1990). The only prerequisite to a party's recovery under these statutes is cohabitation with another person in the good faith belief that they were married. However, that is not

956

how the putative spouse doctrine is statutorily defined in this state by § 42-378. If expansion of the statutory doctrine is deemed warranted, it is the province of the Legislature and not this court to do so. We conclude that because the parties' marriage was valid during its duration and never void or voidable, § 42-378 is not applicable to the facts presented and thus does not provide a legal basis for the alimony and property division awarded to Karen by the district court.

### (b) Constructive Trust

As noted, the district court held that Karen was also entitled to relief, in the alternative, through the imposition of a constructive trust. A constructive trust is a relationship, with respect to property, subjecting the person who holds title to the property to an equitable duty to convey it to another on the ground that his or her acquisition or retention of the property would constitute unjust enrichment. *ProData Computer Servs. v. Ponec*, 256 Neb. 228, 590 N.W.2d 176 (1999); *Hanigan v. Trumble*, 252 Neb. 376, 562 N.W.2d 526 (1997). Real property may be the subject of a constructive trust. *Id.* See, also, *VonSeggern v. Willman*, 244 Neb. 565, 508 N.W.2d 261 (1993); *Kuhlman v. Cargile*, 200 Neb. 150, 262 N.W.2d 454 (1978). Intangible property and liquid assets such as stocks and bank and investment accounts may also be held subject to a constructive trust. See, *Andrews v. Schram*, 252 Neb. 298, 562 N.W.2d 50 (1997); *Gottsch v. Bank of Stapleton*, 235 Neb. 816, 458 N.W.2d 443 (1990). Regardless of the nature of the property upon which the constructive trust is imposed, a party seeking to establish the trust must prove by clear and convincing evidence that the individual holding the property obtained title to it by fraud, misrepresentation, or an abuse of an influential or confidential relationship and that under the circumstances, such individual should not, according to the rules of equity and good conscience, hold and enjoy the property so obtained. *ProData Computer Servs. v. Ponec, supra*; *Brtek v. Cihal*, 245 Neb. 756, 515 N.W.2d 628 (1994).

On appeal, James contends the district court erred in determining that Karen's constructive trust claim was not time barred. We must first determine, as a matter of law, which statute of limitations applies. See, *Blankenau v. Landess*, 261 Neb. 906,

626 N.W.2d 588 (2001); *Adkins v. Burlington Northern Santa Fe RR. Co.*, 260 Neb. 156, 615 N.W.2d 469 (2000). In its division of property, the district court relied upon three exhibits listing the assets of each party. All of the listed assets were personal property, with the exception of a tract of land in Missouri which James had purchased prior to the marriage and which was therefore determined by the district court to be his sole property. Thus, we treat Karen's claim as seeking to impose a constructive trust on personal property including vehicles, household items, stocks, bonds, mutual fund shares, and bank accounts. Neb. Rev. Stat. § 25-207 (Reissue 1995) is the applicable statute of limitations with regard to the establishment of a constructive trust on personal property. *Nemaha Nat. Resources Dist. v. Neeman*, 210 Neb. 442, 315 N.W.2d 619 (1982). Section 25-207 provides in pertinent part: "The following actions can only be brought within four years: . . . (2) an action for taking, detaining or injuring personal property, including actions for the specific recovery of personal property . . . ."

We must next determine when the 4-year limitation period prescribed by § 25-207 began to run. Generally, a period of limitations begins to run upon the violation of a legal right, that is, when the aggrieved party has the right to institute and maintain suit. *Blankenau v. Landess, supra*; *Reinke Mfg. Co. v. Hayes*, 256 Neb. 442, 590 N.W.2d 380 (1999). The statute of limitations does not begin to run against the rights of the beneficiary of a constructive trust until he or she is apprised of the fact that the trustee does not intend to carry out the provisions of the trust. *Nemaha Nat. Resources Dist. v. Neeman, supra*. Karen alleged in her petition that in the belief they were married, she held James "in a trusting fiduciary capacity as her husband [and] did not inquire into or object to [his] financial decisions as to how the investments and assets were titled or held." She further alleged that after learning of the divorce in the fall of 1994, she repeatedly demanded that James agree to an accounting and equitable distribution of the assets, but James refused. Therefore, it is clear from these allegations that Karen was aware by the fall of 1994 that James did not intend to fulfill any fiduciary duty owed to Karen. Thus, unless tolled, the 4-year limitation period began in the fall of 1994.

A petition which makes apparent on its face that the cause of action it asserts is ostensibly barred by the statute of limitations fails to state a cause of action and is demurrable unless the petition alleges some excuse which tolls the operation and bar of the statute. *Tilt-Up Concrete v. Star City/Federal,* 261 Neb. 64, 621 N.W.2d 502 (2001); *Giese v. Stice,* 252 Neb. 913, 567 N.W.2d 156 (1997). Here, it is apparent from the face of the petition that it was filed more than 4 years after the alleged cause of action accrued, and there are no allegations that would toll the operation and bar of the applicable statutes of limitation. Nevertheless, the district court overruled James' demurrer, determining that "pursuant to the case of Schendt v. Dewey, 246 Neb. 573, [520 N.W.2d 541 (1994)], the plaintiff has started [sic] a cause of action and has pled facts that may create an equitable estoppel against the defendant, which would prevent the running of the statute of limitations." Following trial, the district court made a specific finding that "in the fall of 1994, Karen found out the truth and [sic] that she had, in fact, been divorced from James since May 8, 1980. Karen continued to reside with James until the fall of 1998 and filed this action on August 13, 1999." While it acknowledged that the filing occurred more than 4 years after Karen's discovery of the divorce, the district court concluded that the action would not be barred by the statute of limitations because of the fact that the parties resided together until the fall of 1998 and "because of the statements made to her by James."

By its references to *Schendt v. Dewey,* 246 Neb. 573, 520 N.W.2d 541 (1994), and the theory of "equitable estoppel," we understand the district court to have applied either the doctrine of fraudulent concealment or the doctrine of equitable estoppel in pais, or both, to prevent a time bar. In *Schendt* and other professional negligence cases, we have recognized that the doctrine of fraudulent concealment may estop a defendant from asserting a statute of limitations defense when the defendant has, either by deception or by a violation of a duty, concealed from the plaintiff material facts which prevent the plaintiff from discovering professional negligence. See, also, *Gering - Ft. Laramie Irr. Dist. v. Baker,* 259 Neb. 840, 612 N.W.2d 897 (2000); *Muller v. Thaut,* 230 Neb. 244, 430 N.W.2d 884 (1988). We have also recognized that the equitable doctrine of estoppel in pais may, in

a proper case, be applied to prevent a fraudulent or inequitable resort to a statute of limitations, and a defendant may, by his or her representations, promises, or conduct, be so estopped where the other elements of estoppel are present. *Hullinger v. Board of Regents*, 249 Neb. 868, 546 N.W.2d 779 (1996); *Reifschneider v. Nebraska Methodist Hosp.*, 233 Neb. 695, 447 N.W.2d 622 (1989). The elements of equitable estoppel are, as to the party estopped: (1) conduct which amounts to a false representation or concealment of material facts, or at least which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) knowledge, actual or constructive, of the real facts. As to the other party, the elements are: (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (3) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his or her injury, detriment, or prejudice. *Hullinger v. Board of Regents, supra*; *Hamilton v. Hamilton*, 242 Neb. 687, 496 N.W.2d 507 (1993); *State v. Nebraska Assn. of Pub. Employees*, 239 Neb. 653, 477 N.W.2d 577 (1991); *Reifschneider v. Nebraska Methodist Hosp., supra*. The first prong of this test is met when one lulls his or her adversary into a false sense of security, thereby causing that person to subject his or her claim to the bar of the statute of limitations, and then pleads the very delay caused by his or her conduct as a defense to the action when it is filed. *Woodard v. City of Lincoln*, 256 Neb. 61, 588 N.W.2d 831 (1999).

Karen did not specifically plead any statements by James as grounds for tolling the limitations period on the basis of fraudulent concealment or equitable estoppel in pais. On appeal, she relies on the following testimony she gave at trial:

[Plaintiff's counsel:] Do you recall having any conversations with Mr. Manker about telling people that you were not married?

[Karen:] Yeah, he said we couldn't do that. And we kept filing taxes the same, because he said if we changed our

filing of our income tax then it would alert the IRS and we'd be into a lot of trouble. And he'd lose his job.

The district court made a specific finding regarding this testimony and noted that it was not disputed or denied by James. It is clear from the record that these statements were made by James *after* his disclosure of the dissolution in the fall of 1994, and therefore, they cannot be characterized as an effort to fraudulently conceal that fact.

██ But equitable estoppel is not limited to circumstances of fraud. The doctrine of equitable estoppel may be applied to prevent an inequitable resort to a statute of limitations as well, and a defendant may, by his or her representations, promises, or conduct, be so estopped where the other elements of estoppel are present. *Hullinger v. Board of Regents*, 249 Neb. 868, 546 N.W.2d 779 (1996); *Reifschneider v. Nebraska Methodist Hosp.*, 233 Neb. 695, 447 N.W.2d 622 (1989).

██ In this regard, it is important to remember that a constructive trust is an equitable remedy intended to prevent unjust enrichment. The general principles of law governing constructive trusts are collected in the Restatement of Restitution § 163 (1937). Section 148 of the Restatement deals with laches and statutes of limitations as they relate to equitable actions for restitution. The comments provide that "in the absence of evidence of other circumstances the complainant normally is barred if the period of the statute of limitations applicable to actions at law in analogous situations would have run . . . ." *Id.*, § 148, comment *b*. at 590. But the comments list several circumstances that will excuse the complainant's delay including

the fact that the respondent stood in a fiduciary or confidential relationship to the complainant who, because of that, hesitated to begin proceedings; the fact that the respondent was in a superior economic position to the complainant as where he was the complainant's creditor or employer; the fact that the complainant could not secure proper advice or that he was ignorant and did not understand his rights; the fact that the respondent fraudulently concealed the facts; the fact that the conduct of the respondent delayed proceedings, as where he could not be located, or where he sought to prevent action or caused

delay by promises of satisfaction; or the fact that evidence was not available.

*Id.* at 590-91. We do not imply that every reason listed in the comments will toll the statute of limitations in an action for restitution. However, under the unique circumstances of this case, the issue is whether James' conduct prevents him from asserting the statute of limitations as a defense. The district court concluded that the action was not time barred because of the statements James made to Karen.

Equity is not a rigid concept, and its principles are not applied in a vacuum. Equity is determined on a case-by-case basis when justice and fairness so require. Equity may be used under appropriate circumstances, and equitable principles may prevent one from asserting a particular defense when it would be unfair or unjust to allow that person to do so.

The doctrine of equitable estoppel may be applied to prevent an injustice or a harsh and unfair result. A claim of equitable estoppel rests in equity, and in an appeal of an equity action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the trial court. *State ex rel. Neb. Health Care Assn. v. Dept. of Health*, 255 Neb. 784, 587 N.W.2d 100 (1998). Under the doctrine of unclean hands, a person who comes into a court of equity to obtain relief cannot do so if he or she has acted inequitably, unfairly, or dishonestly as to the controversy in issue. *Fritsch v. Hilton Land & Cattle Co.*, 245 Neb. 469, 513 N.W.2d 534 (1994).

James' conduct is summarized as follows: From 1980 to 1994, Karen believed the parties were married because James did not tell her they were divorced. For 14 years, James accumulated valuable assets in his name alone. After Karen discovered the fraud, James said to her that if she told anyone that they were not married, they would both be in trouble with the Internal Revenue Service and he would lose his job. Karen testified about having conversations with James about telling people that they were not married. James told Karen she could not tell anyone and that they kept filing taxes the same "because he said if we changed our filing of our income tax then it would alert the IRS and we'd be into a lot of trouble. And he'd lose his job."

James did not dispute making these statements, and the district court specifically found that it was clear from the record that these statements were made after Karen discovered that the parties were not married. It is not when Karen discovered they were not married that is important, but what James told her after she knew. These representations were made by James with the intent to induce Karen not to take any action because of the threat of trouble, including the loss of his job, and these inducements continued because the parties kept filing their taxes the same way or "we'd be into a lot of trouble." Karen commenced her action in 1999 after James moved out of the house.

As a result of James' statements, the district court imposed a constructive trust and denied application of the statute of limitations as a defense. James occupied the superior position in the relationship. He controlled all the assets. Although the parties considered separating at times, this does not mean that when the parties had an argument, Karen was no longer influenced by James' statements about the trouble they both would incur. The fact that they did not separate indicates some intent to remain together. In addition, James handled all of the business transactions, and Karen was dependent upon him for her support and income. This dependency put James in a position to exert influence over Karen to his own benefit.

Statements made concerning trouble with the Internal Revenue Service and the loss of a means of support were made as strong inducements to Karen to take no action. It is highly significant that after Karen discovered that the parties were not married, James induced Karen not to take any action to protect her interests with the threat of legal and financial trouble. The strong inference is that he intended to deter her from seeking outside advice. Under these circumstances, we conclude that the district court did not err in applying equitable principles to prevent James from asserting a statute of limitations defense. See *Baker v. Pattee*, 684 P.2d 632, 636 (Utah 1984) ("in cases of undue influence and duress the limitation period begins with the termination of the influence").

The application of equitable estoppel in this case is consistent with the requirements of a constructive trust. A person seeking a constructive trust must prove by clear and convincing evidence

that the individual holding the property obtained it by fraud, misrepresentation, or an abuse of an influential or confidential relationship and that under such circumstances, such individual should not, according to the rules of equity and good conscience hold and enjoy the property so obtained.

The facts of this case support the district court's finding of a constructive trust and that James was estopped from asserting the statute of limitations as an affirmative defense. The court did not err in finding that the evidence supported an equitable duty and a constructive trust regarding the property acquired by James.

## VI. CONCLUSION

For the reasons discussed herein, we affirm that portion of the district court's order which determined that James was the father of the minor child, awarded custody of the child to Karen subject to James' reasonable rights of visitation, and required James to pay child support in the amount of $958 per month. We also affirm that portion of the order which requires James to furnish health insurance for the minor child and pay three-fourths of all noncovered medical, dental, eyeglass, optometric, and prescription medicine expenses incurred by or for such child which are not paid by insurance. We reverse and vacate the award requiring James to pay alimony. We affirm the award of personal property to Karen, including the judgment in the amount of $138,527 in favor of Karen, the qualified domestic relations order, and the constructive trust on James' assets ordered by the district court in order to effectuate such transfer. That portion of the order determining the sole and separate property held by each party is affirmed.

AFFIRMED IN PART, AND IN PART
REVERSED AND VACATED.

STEPHAN, J., concurring in part, and in part dissenting.

I agree with the majority that the paternity, custody, visitation, and child support claims in this action are not time barred, and I concur in the affirmance as to those issues. I also agree with the majority that Karen cannot be considered a "putative spouse" under Neb. Rev. Stat. § 42-378 (Reissue 1998) because her marriage to James was never void. If I could reach the merits of the constructive trust claim, I would agree with the majority and the

district court that it is supported by the evidence. I cannot reach the merits, however, because in my opinion, the constructive trust claim is barred by the 4-year limitations period prescribed by Neb. Rev. Stat. § 25-207 (Reissue 1995).

While this case involves highly unusual facts, it must nevertheless be considered and adjudged by applying the basic rules of pleading and proof which we apply in all civil actions. The issues in a case are framed by the pleadings. *City State Bank v. Holstine*, 260 Neb. 578, 618 N.W.2d 704 (2000). Nebraska law defines pleadings as the written statements by the parties of the facts constituting their respective claims and defenses. *Sydow v. City of Grand Island, ante* p. 389, 639 N.W.2d 913 (2002); *Christianson v. Educational Serv. Unit No. 16*, 243 Neb. 553, 501 N.W.2d 281 (1993). The purpose of pleadings is to frame the issues upon which a cause is to be tried, and the issues in a given case will be limited to those which are pled. *V.C. v. Casady*, 262 Neb. 714, 634 N.W.2d 798 (2001); *Alegent Health Bergan Mercy Med. Ctr. v. Haworth*, 260 Neb. 63, 615 N.W.2d 460 (2000).

In her petition, Karen alleged that James concealed the fact of their 1980 divorce and that because of the trust she placed in him, she did not discover the truth concerning the divorce until the fall of 1994. Her right to maintain an action for recovery based upon a constructive trust theory accrued at the time of this discovery, but her petition was not filed until August 13, 1999, well outside the 4-year limitations period. A petition which makes apparent on its face that the cause of action it asserts is ostensibly barred by the statute of limitations fails to state a cause of action and is demurrable unless the petition alleges some excuse which tolls the operation and bar of the statute. *Tilt-Up Concrete v. Star City/Federal*, 261 Neb. 64, 621 N.W.2d 502 (2001); *Giese v. Stice*, 252 Neb. 913, 567 N.W.2d 156 (1997); *Vanice v. Oehm*, 247 Neb. 298, 526 N.W.2d 648 (1995). Karen's petition alleged no specific reason why she was prevented or legally excused from filing her petition within 4 years after discovering that she and James were divorced. Therefore, in my opinion, James' demurrer to the petition should have been sustained.

When the demurrer was overruled, James filed an answer alleging that all of Karen's claims were barred by the statute of

limitations. The record does not reflect that Karen filed a reply denying this allegation or alleging any factual basis or theory upon which the running of the limitations period would be tolled. At trial, Karen admitted that she became aware of the divorce in the fall of 1994 when she consulted a lawyer who determined from court records that the decree had been entered in 1980. Karen was not asked, and she did not testify, why she waited until August 1999 to initiate this action.

In concluding that James was equitably estopped from asserting a statute of limitations defense, the district court and the majority focus on the fact that after Karen learned of the divorce, James told her that public disclosure of that fact would cause problems with the Internal Revenue Service and his employer. While the record reflects that these statements were made, there is no evidence to suggest that they influenced Karen's decision to forgo filing this lawsuit in a timely manner. Karen testified unequivocally that upon learning of the divorce in 1994, she distrusted and disliked her former spouse, and that beginning in the fall of 1994, she asked him on several occasions to move out of the family home, which he eventually did in 1998. After learning of the divorce, Karen declined James' offers of remarriage because, in her words, "I didn't trust him, I didn't—I mean after that, you just don't believe anything he's ever going to say." She admitted that she was at all times free to speak with a lawyer and in fact did obtain legal advice concerning the status of her marriage after James first mentioned the divorce in 1994. She also discussed the divorce with her sister and a personal friend in 1994. At trial, Karen was not asked why she waited more than 4 years after learning of the divorce to initiate this action, and she offered no testimony which could fairly be interpreted as an explanation or justification for the delay. On appeal, Karen did not argue equitable estoppel as a basis for tolling the limitations period, but, rather, contended that "a putative spouse is not subject to any statute of limitations." Brief for appellee at 20.

Based upon my reading of the record, the issue of whether James was equitably estopped from asserting a statute of limitations defense to the claim for distribution of property under a constructive trust theory was neither framed by the pleadings

nor resolved in Karen's favor by the evidence adduced at trial. Because it is undisputed that the claim was filed outside the limitations period and no grounds for tolling were alleged or proved, I respectfully dissent from that portion of the majority opinion affirming the award of personal property to Karen. I recognize that this result runs contrary to how many might view the equities of this case, but for the reasons stated, I believe it is nevertheless required by the law.