DANNY J. TRIEWEILER, INDIVIDUALLY AND ON BEHALF OF VARSITY INVESTMENTS, INC., A NEBRASKA CORPORATION, APPELLEE, V. DON M. SEARS, APPELLANT.
DANNY J. TRIEWEILER, INDIVIDUALLY AND ON BEHALF OF VARSITY INVESTMENTS, INC., A NEBRASKA CORPORATION, APPELLEE, V. DAVID J. CAMPAGNA, APPELLANT.

689 N.W.2d 807

Filed December 17, 2004. Nos. S-02-134, S-02-135.

954

James B. Cavanagh, of Lieben, Whitted, Houghton, Slowiaczek & Cavanagh, P.C., L.L.O., for appellants.

Aimee J. Haley, of Fullenkamp, Doyle & Jobeun, and Amy Sherman Geren, of Geren Law Office, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

## NATURE OF CASE

Danny J. Trieweiler, the appellee, brought these corporate derivative actions in the district court on behalf of Varsity

Investments, Inc., a closely held corporation, against the other two shareholders of the corporation, David J. Campagna and Don M. Sears, the appellants. Generally, Trieweiler alleged that Campagna had breached a fiduciary duty by misappropriating money from the corporation, that Sears breached a fiduciary duty by failing to exercise reasonable care in the performance of his duties as a corporate director, and that both of the appellants had breached fiduciary duties by usurping a corporate opportunity. After a bench trial, the court found for Trieweiler on each of these claims and entered judgment accordingly. Although this appeal involves many issues, the fundamental questions presented are whether Trieweiler presented sufficient evidence to prove that the appellants breached their respective fiduciary duties to the corporation and, if so, whether the corporation's damages were proved with reasonable certainty.

## FACTS

The following factual narrative is intended to provide the reader with the information necessary to understand our disposition of this appeal. Additional facts will be examined, in detail, in later sections of this opinion, as necessary for our analysis. The record in this case is extensive, containing thousands of pages of testimony and exhibits, and was difficult to review. We have conducted a comprehensive examination of the record, but a complete summary of all the evidence would be both impractical and unwieldy. Our election to not expressly mention each piece of relevant evidence should not be read to mean that we have not reviewed the record thoroughly, and carefully considered all the pertinent facts.

Because this case involves several business entities with similar names, we pause at the outset to explain, generally, how those entities are denominated. The first business at issue in this case is the "Varsity Sports Café," a bar, which opened in downtown Omaha in 1994. The Varsity Sports Café was owned and operated by "Varsity Investments" until 1997, when it was sold for an original purchase price of $200,000. The other business at issue in this case is the "Varsity West," also a bar, which opened in 1995. The Varsity West was owned and operated by "JVI, Inc.," or "Junior Varsity." Varsity West was sold later in 1995 for $186,000.

## Business Operations

Trieweiler testified that he moved to Omaha in 1990 and worked at the Three Cheers bar as owner and manager. Trieweiler assisted with construction and remodeling projects at Three Cheers. Trieweiler was introduced to Campagna in 1993 by Campagna's cousin, because Campagna wanted to open a sports bar. The business plan was to start out with a sports bar, "get it going," and open up a string of sports bars.

Trieweiler testified that Sears, Campagna's father-in-law, was to handle the financing for the venture. Trieweiler was to be a 30-percent shareholder in the business, Campagna a 60-percent shareholder, and Sears a 10-percent shareholder. Trieweiler was to be responsible for handling the design work, carpentry, and tile work. Campagna was responsible for "putting the whole deal together" and "it was his idea." Sears had no day-to-day responsibilities in the opening or operation of the business.

Varsity Investments was formed to run the resulting venture, the Varsity Sports Café, in March 1994. According to Trieweiler, before the bar opened, he was to negotiate the lease and act as the general contractor. Trieweiler testified that he was actually involved in the labor related to construction and that he "did most of the construction." After the bar opened, Trieweiler was manager during the day. He handled the banking in the morning, balanced the cash register drawers, helped with cleaning and during lunch, then continued construction on the second level of the building later in the day. Trieweiler held the position of day manager between June and November.

At trial, Trieweiler described the process of balancing the cash register drawers. Every cash register contained a "Z-tape," which totaled out and broke down what had been rung into the register that day. Each morning, Trieweiler would take the Z-tape; count the cash, checks, and credit card payments; subtract the money that had been in the register initially; and see if it balanced out. The bartenders also handed in a sheet of any cash paid out, which amount Trieweiler included in the calculations. That process generated a "daily work sheet," which was attached to the Z-tape and kept in a filing cabinet on the premises. Trieweiler said that sometimes during the week the registers would have more credit

card payments than cash, but receipts were mostly cash, and the bar was essentially a cash-based business.

According to Trieweiler, Campagna's day-to-day duties after the bar opened were to work nights and weekends. But Trieweiler also testified that before the bar opened, Campagna wrote checks to himself for unknown reasons. Trieweiler said that he did not have access to the company checkbook, which was controlled by Campagna. However, Campagna testified that while Trieweiler was at the Varsity Sports Café, Trieweiler wrote most of the checks.

### FINANCIAL IRREGULARITIES

According to Trieweiler, he and Campagna had agreed to receive $500 per week as salary once the bar opened; Trieweiler testified that his $500 salary did not change from the time the bar opened until it was fully staffed. Campagna testified that in 1994, he received $15,000 in salary through Varsity Investments' payroll service. Campagna apparently received $34,700 in salary in 1995, although his testimony on that subject was evasive and inconsistent, and it appears that his income may have been underreported in his tax filings for that year. Campagna received $36,250 in salary in 1996. Campagna testified that in 1997, he went "off payroll" and paid himself as it could be afforded, by writing himself a check. However, that income was not reflected in Campagna's tax records. Campagna claimed that his salary income from Varsity Investments in 1997 was $11,861.04.

Campagna also admitted at trial to taking an extra $10,000 from Varsity Investments in 1994 as a "bonus," although his trial testimony was not consistent with testimony given during his deposition, when he had said that the money was spent on business expenses. Pretrial interrogatories directed Campagna to identify money or assets received from Varsity Investments from 1993 to 1997, but the $10,000 "bonus" was not revealed in Campagna's answers to those interrogatories.

Varsity Investments never had a corporate credit card. Bank records indicate that Varsity Investments' funds were used to pay Campagna's personal credit cards, but Campagna testified that these payments were reimbursements for business expenses that Campagna had charged to his personal credit cards.

## Trieweiler's Departure

Trieweiler left his employment with the Varsity Sports Café on November 2, 1994. Trieweiler testified that he left on that date due to a number of concerns. He testified first that a $500 check for a beer distributor "bounced." Trieweiler was notified that he and his own company were being sued personally by a subcontractor. Furthermore, a final notice was posted for disconnection of the bar's electricity; Trieweiler said that he found two unopened utility bills in the office. Finally, a band that had played at the bar called and reported that the $1,200 check with which they had been paid had "bounced," but Trieweiler thought that band was to have played for door money and was not supposed to have been paid by the bar at all. Trieweiler found that the $1,200 "bounced" check was entered in the checkbook as payment to the Nebraska Department of Revenue.

Trieweiler testified that Campagna was responsible for paying the business' bills. Trieweiler confronted Campagna on November 2, 1994, with all of his concerns and then took a 2-week leave of absence. Trieweiler returned on November 15, and according to Trieweiler, Campagna told Trieweiler that he was being replaced as manager, the locks on the doors had been changed, and he was to be replaced on the board of directors. Trieweiler testified that he never received a share of corporate profits or any distribution as a shareholder and that he had not been paid for his shares of Varsity Investments. Campagna denied telling Trieweiler that his shares of Varsity Investments would not be honored. However, the Varsity Sports Café's liquor license renewal form for 1996, submitted by Campagna, stated that Trieweiler's shares had been transferred to Campagna.

## Business Records

Campagna was in charge of the books and records of Varsity Investments during 1995 to 1997. Trieweiler asked Campagna to allow Trieweiler to review the books and records of the business in January 1995. According to Trieweiler, Campagna replied, "We'll give it to you later." Trieweiler testified that he never received all the records. Trieweiler received incomplete check stubs, but never received daily report sheets, Z-tapes, invoices, or state tax returns.

Trieweiler testified that he notified Sears of his concerns about the business in February 1995, but never heard back from Sears. Sears acknowledged receiving a letter from Trieweiler, but did not recall the contents of the letter. Sears stated that when he invested in Varsity Investments, he had no expectation of profit; he simply wanted to provide Campagna with a business opportunity. Sears testified that during his tenure as an officer, director, and shareholder of Varsity Investments, he never attended a shareholders' meeting, reviewed any books or records, asked to review any books or records, or voted on any issues other than the removal of Trieweiler as a director. Sears was physically present at the Varsity Sports Café only once, at the opening. Sears stated that Campagna had told him that the Varsity Sports Café was having trouble covering expenses, but that Sears did not request a profit-and-loss statement, tax return, or any other financial documents.

Trieweiler stated that because he had been preparing the daily sales sheets and making the company's bank deposits, he knew that in October 1994, the business was generating enough profits to meet its obligations. However, Trieweiler testified that on days when he had not balanced the drawers, prepared the daily sales sheets, and made the bank deposits, he had no way of knowing whether the sales from the day were actually deposited in the bank. Trieweiler said that he requested records from that period, but they were unavailable. Trieweiler reported that in 1997, when asked about all of the business' missing records, Campagna said that he thought "the cleaning guy threw them away and that's my story and I'm sticking to it."

Campagna testified that records were maintained on computer and that hard copies were retained of daily sales sheets and Z-tapes. However, Campagna testified that the business stopped maintaining daily sales sheets in 1996 or 1997, because he "didn't want to get anybody in trouble with the IRS. There's a lot of people on daily cash that were paid cash." Campagna testified that the records that had been created and maintained by Varsity Investments during 1994 to 1996 were lost or destroyed in 1997.

Campagna admitted that Trieweiler had asked to review the company's financial records before Campagna stopped retaining those records and that Trieweiler had, before 1997, requested

the records that were lost or destroyed. Campagna admitted that the Varsity Investments' records that had been on computer were sold, with the computer, to the purchaser of the Varsity Sports Café and that a copy of those records had not been maintained, despite the fact that the records had already been requested by Trieweiler at the time. No daily sales worksheets were turned over to Trieweiler.

Trieweiler testified that he was eventually able to review "two or three different boxes" of Z-tapes that were turned over in May 1997. Trieweiler stated that the Z-tapes he received did not include all of the "grand total tapes," which tapes were a record of all the transactions entered into each register over an extended period of time. Trieweiler reported reviewing a box of bank statements and checks, although Trieweiler stated that some of the checks were missing. Additional records were obtained from the bank. Trieweiler testified that records had been obtained from liquor and beer distributors. Finally, Trieweiler stated that he had been able to review Campagna's and Sears' tax records, and Campagna's bank account records. Trieweiler was also able to obtain some records from the individual who purchased the Varsity Sports Café in 1997. Campagna verified the authenticity of those records.

## FORENSIC ACCOUNTING TESTIMONY

Trieweiler's key witness at trial was Rodney Anderson, a certified public accountant retained by Trieweiler to examine the financial records available to Trieweiler. The appellants' specific complaints with respect to the foundation for Anderson's testimony will be discussed in more detail below. In general, Anderson reviewed bank records for Varsity Investments and attempted to determine whether Varsity Investments' bank deposits included all of the income generated by operation of the business. Anderson testified that his task would have been easier had certain types of financial records been available to him, such as detailed general ledgers, a check register, a cash receipts listing, any kind of payroll information, employee expense reports, bank reconciliations, cash register receipts, invoices for expenses paid out of the drawers, and billing or expense information.

Anderson calculated that based solely on Varsity Investments' tax returns, the total losses for the business from 1994 to 1997

were \$41,380. However, financial records recovered from the Varsity Investments' computer that was sold with the business led Anderson to conclude, when considered with other financial records, that Varsity Investments actually generated net sales for that period of \$264,000. Because of the lack of information from a daily sales sheet, Anderson also calculated Varsity Investments' income by using the average monthly sales, and subtracting the cost of goods sold that had been reported on the tax returns; he calculated a total income for 1994 to 1997 of \$331,000.

Anderson also conducted a depository analysis on Varsity Investments' bank records. Anderson identified the ordinary deposits, which would represent revenue from the business' daily sales, and concluded that the total sales for the business exceeded the total bank deposits by \$243,232.35. Anderson examined bank records obtained from Campagna and his wife, compared those records to information about gifts and loans that was provided in response to Trieweiler's interrogatories, and also excluded identifiable sources of regular income. Anderson concluded that \$117,915.88 of deposits made into the Campagnas' bank accounts in 1994 to 1997 were unexplained.

## VARSITY WEST

Trieweiler testified that in October 1994, Campagna found a location in southwest Omaha for a second bar. Trieweiler admitted that when asked about a new location, he might have said that the new location was not a good idea because of the bar's financial situation. Trieweiler explained that at that time, the bar's checks were "bouncing," payroll checks were "bouncing," bills were not getting paid, and the business was still paying off the construction loans on the first location. Trieweiler said that he had no further discussion with Campagna or Sears about the second location and that he did not learn about Varsity West until a liquor license application for Varsity West was submitted in 1995. Campagna conceded that after October 1994, Trieweiler was not informed of or consulted about the Varsity West development. Trieweiler admitted, with respect to Varsity West, that he had no access to any assets, between October 1994 and February 1995, that he could have invested in the new project.

The Varsity West location opened at the same location Trieweiler had discussed with Campagna. The Varsity West development was undertaken by a new corporation known as JVI, Inc., or Junior Varsity. However, the Bank of Nebraska loaned Varsity Investments, doing business as Varsity Sports Café, $75,000 for the purpose of opening the Varsity West location. The loan was requested by the appellants, entered into by the appellants on behalf of Varsity Investments, and was secured by the assets of Varsity Investments. But Campagna was to own 51 percent of Varsity West, Sears 10 percent, and Jeff Sears, Sears' son, 39 percent. The appellants personally guaranteed the loan, and the bank officer testified that the loan would not have been made had Sears not guaranteed it. Sears also gave Campagna a $30,000 loan for the Varsity West project, but was "[n]ot exactly" aware of what happened to that money.

A corporate resolution of Varsity Investments required a meeting and a vote of the shareholders to borrow money. Trieweiler testified that he was aware of no vote by Varsity Investments to incur any debt for use by Varsity West, no authorization to run Varsity West expenses through Varsity Investments, and no authorization to allow Varsity Investments to guarantee debt incurred by Varsity West. Trieweiler also testified that he had no knowledge of any loans made by Campagna to Varsity Investments.

After Varsity West was launched, Varsity Investments' payroll account was used to pay the employees of Varsity West. Insurance for Varsity West was obtained through Varsity Investments' insurance policy. Varsity West's credit card receipts were run through Varsity Investments' terminal. Campagna also conceded that during the operation of Varsity West, it engaged in joint advertising with the Varsity Sports Café and the advertising indicated a relationship between the businesses.

## LITIGATION

After other litigation that is not relevant to this proceeding, Trieweiler filed derivative actions against the appellants in the district court, individually and on behalf of Varsity Investments, alleging two causes of action against each appellant. First, Trieweiler alleged the appellants had, in opening Varsity West, usurped a corporate opportunity belonging to Varsity Investments.

Second, Trieweiler alleged money and assets had been misappropriated from Varsity Investments in the operation of the Varsity Sports Café.

After trial, the district court entered judgment against the appellants. Many of the district court's conclusions of law and fact will be discussed in more specific detail as necessary for our analysis below. Generally, the court concluded that funds had been diverted from the Varsity Sports Café by Campagna and that determining the exact amount had been made impossible by Campagna's failure to retain records from the business. The court further determined that Sears had not fulfilled his duties as a corporate director and was jointly liable for Campagna's misappropriation. Based on Anderson's testimony, the court attributed $168,000 in losses from Varsity Investments to the appellants. The court also concluded that Varsity West was a corporate opportunity of Varsity Investments and that the two operations "were inextricably bound together in one enterprise." The court also noted that documents which would have made the exact nature of the corporate relationships clear had been destroyed.

The court ordered that 30 percent of the sales proceeds from Varsity West, or $26,725.25, should be awarded to Trieweiler. The court also awarded Trieweiler $16,000 in "unpaid wages," as a debt of Varsity Investments. Trieweiler was awarded 30 percent of the proceeds of the sale of the Varsity Sports Café, or $12,633.75. The court concluded that under the "exceptional circumstances" presented, Trieweiler should be permitted a direct recovery against the appellants for 30 percent of the money misappropriated from Varsity Investments, and the court ordered a payment of $50,400. Thus, the court entered a total judgment in favor of Trieweiler in the amount of $105,759. (The court's order sets forth the figure of $105,759 twice, which is logical because that is the sum of the court's underlying calculations of damages. However, the final disposition contained in the court's order sets forth a figure of $105,359, with no ready explanation for the difference of $400. We assume that $105,759 is the correct figure.) The court directed that Trieweiler's shares in the corporation be transferred to the appellants upon satisfaction of the judgment. Postjudgment, Trieweiler filed a timely motion for expenses, including attorney fees, pursuant to Neb. Rev. Stat. § 21-2076

(Reissue 1997). The court awarded costs and attorney fees, purportedly pursuant to § 21-2076(1) and (3), in the amount of $96,037.34.

## ASSIGNMENTS OF ERROR

 · Although Campagna and Sears come before this court with distinct legal positions, and have filed separate briefs, those briefs present essentially indistinguishable arguments, and these cases have been consolidated for disposition by this court. Consequently, the assignments of error before this court do not distinguish between the appellants.

Furthermore, the appellants' briefs assign 14 errors, many of which are very vague, such as assigning error "in the conclusions of law not supported by sufficient evidence." A generalized and vague assignment of error that does not advise an appellate court of the issue submitted for decision will not be considered. *Miller v. City of Omaha*, 253 Neb. 798, 573 N.W.2d 121 (1998). In this case, we consider the appellants' more specific assignments of error, as we have consolidated and restated them in light of the supporting arguments made in the appellants' briefs.

The appellants assign, consolidated, restated, and reordered, that the district court erred by (1) permitting Trieweiler to present evidence of "excess revenues" when he pled specific acts of misappropriation, (2) determining that Trieweiler could bring a derivative proceeding, (3) concluding Sears was jointly and severally liable, (4) awarding damages to Trieweiler (a) in his individual capacity and (b) for "unpaid wages," (5) finding Anderson's testimony to be reliable and the evidence of damages to be sufficient, (6) concluding that Varsity West was an usurped corporate opportunity of Varsity Investments, and (7) awarding attorney fees.

In addition, Trieweiler's brief contains two purported "assignments of errors" that contend the district court's award was insufficient. We do not consider these purported errors, as Trieweiler has failed to properly designate a cross-appeal pursuant to Neb. Ct. R. of Prac. 9D(4) (rev. 2001). See *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 602 N.W.2d 439 (1999).

## STANDARD OF REVIEW

A shareholder's derivative action which seeks an accounting and the return of money is an equitable action. In an appeal of

an equitable action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided that where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Woodward v. Andersen*, 261 Neb. 980, 627 N.W.2d 742 (2001).

The admissibility of evidence is reviewed for an abuse of discretion where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court. *Reimer v. Surgical Servs. of the Great Plains*, 258 Neb. 671, 605 N.W.2d 777 (2000). It is within the trial court's discretion to determine whether there is sufficient foundation for an expert witness to give his or her opinion about an issue in question. *Stukenholtz v. Brown*, 267 Neb. 986, 679 N.W.2d 222 (2004).

On appeal, a trial court's decision awarding or denying attorney fees will be upheld absent an abuse of discretion. *Simon v. City of Omaha*, 267 Neb. 718, 677 N.W.2d 129 (2004).

## ANALYSIS

Before discussing the appellants' specific arguments, it is helpful to review the basic principles underlying a corporate derivative action of this kind. As a general rule, a shareholder may not bring an action in his or her own name to recover for wrongs done to the corporation or its property. Such a cause of action is in the corporation and not the shareholders. The right of a shareholder to sue is derivative in nature and normally can be brought only in a representative capacity for the corporation. *Meyerson v. Coopers & Lybrand*, 233 Neb. 758, 448 N.W.2d 129 (1989). In legal effect, a stockholders' derivative suit is one by the corporation conducted by the stockholder as its representative. The stockholder is only a nominal plaintiff, the corporation being the real party in interest. *Rettinger v. Pierpont*, 145 Neb. 161, 15 N.W.2d 393 (1944).

However, there is a well-recognized exception to the general rule: If the shareholder properly establishes an individual cause of action because the harm to the corporation also damaged the shareholder in his or her individual capacity, rather than as a

shareholder, such individual action may be maintained. *Meyerson, supra.* It is only where the injury to the plaintiff's stock is peculiar to him or her alone, such as in an action based on a contract to which the shareholder is a party, or on a fraud affecting him or her directly, and does not fall alike upon other shareholders, that the shareholder may recover as an individual. *Id.*

Although the burden is ordinarily upon the party seeking an accounting to produce evidence to sustain the accounting, when another person is in control of the books and has managed the business, that other person is in the position of a trustee and must make a proper accounting. *Woodward, supra.* While fraud cannot be presumed or inferred without proof in a court of equity any more than in a court of law, courts of equity are not restricted by the same rules as courts of law in the investigation of fraud and the proofs required to establish it. *Bauermeister v. McReynolds,* 254 Neb. 118, 575 N.W.2d 354 (1998) (supplemental opinion). The burden of proof is upon a party holding a confidential or fiduciary relation to establish the fairness, adequacy, and equity of a transaction with the party with whom he or she holds such relation. *Woodward v. Andersen,* 261 Neb. 980, 627 N.W.2d 742 (2001).

### SCOPE OF PLEADINGS

The appellants' first two assignments of error, although distinct, both involve examination of Trieweiler's operative petition against Campagna. The appellants first assign that the district court erred in permitting Trieweiler to present evidence of "excess revenues" when he pled specific acts of misappropriation. The appellants claim that Trieweiler pled specific acts of misappropriation from Varsity Investments by Campagna, but failed to prove those allegations, and instead only presented evidence of missing corporate revenue. The essence of the appellants' argument is that Trieweiler's evidence did not conform to, or support, the allegations made in his pleadings.

The appellants correctly identify the controlling proposition of law, that a party will not be permitted to plead one cause of action and upon trial rely upon proof establishing another. *Abdullah v. Nebraska Dept. of Corr. Servs.,* 246 Neb. 109, 517 N.W.2d 108 (1994). Proof must correspond with the allegations in

the pleadings, and relief cannot be granted upon proof of a cause substantially different from the case made in the pleadings. *Id.*

However, the appellants' argument is premised upon a misrepresentation of Trieweiler's petition. In his operative amended petition, Trieweiler alleged that corporate funds

> were misappropriated and/or wasted by [Campagna] or by employees of the Corporation due to [Campagna's] mismanagement, and/or monies of the Corporation were excessively and unfairly paid, awarded or distributed, in an amount of at least $264,000, *including but not limited to the following respects and particulars*:
>
>  . . . .
>  . . . misappropriation of cash monies of the Corporation in an amount yet to be ascertained.

(Emphasis supplied.) The petition contained specific allegations of misappropriation totaling $110,556.93, but also identified several acts of misappropriation for amounts of money "yet to be ascertained." Because of that uncertainty, Trieweiler concluded in his operative petition that "[a]ccordingly, the Corporation has been damaged in the amount of profits, monies and other assets misappropriated, wasted and/or excessively and unfairly paid, awarded or distributed in a total amount yet to be ascertained and an accounting is necessary to ascertain said amount."

It is evident from even a casual reading of Trieweiler's petition that the evidence presented at trial of missing corporate revenues was relevant to prove Trieweiler's general allegations of misappropriation. In other words, the evidence presented at trial adequately conformed to the allegations in the pleadings, see *Abdullah, supra*, and the appellants' first assignment of error is without merit.

Second, the appellants assign that Trieweiler should not have been allowed to bring a derivative action. Their argument is that since Trieweiler sought damages to be awarded to him individually, instead of to the corporation, Trieweiler was not acting in a representative capacity for the corporation. See *Meyerson v. Coopers & Lybrand*, 233 Neb. 758, 448 N.W.2d 129 (1989). The appellants claim that "Trieweiler consistently pled and maintained that the purpose of these lawsuits was to obtain payment to himself . . . . He was not bringing an action seeking

recovery on behalf of the corporation." Brief for appellant Campagna at 18.

However, the appellants have again misrepresented Trieweiler's operative petition, which concludes as follows:

> WHEREFORE, [Trieweiler], individually, and on behalf of Varsity Investments, Inc., prays for a judgment against [Campagna] in favor of Varsity Investments, Inc. in an amount of at least $264,000.00 for damages due to [Campagna's] breaches of fiduciary duty, mismanagement and/or misappropriation, or, alternatively, a judgment against [Campagna], in favor of . . . Trieweiler, for 30% of the damages to Varsity Investments, Inc.; for reasonable attorney's fees; the costs of this action and any other relief this Court deems is just and equitable under the circumstances.

Trieweiler's operative petition clearly seeks damages on behalf of the corporation, and individual damages are sought only in the alternative. Furthermore, as previously noted, there are circumstances in which individual damages may be appropriately awarded in connection with a derivative action. See *id.* See, generally, 13 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations § 6028 (perm. ed., rev. vol. 1995). We will discuss whether those circumstances were present in this case in more detail below. For purposes of resolving this issue, it is necessary only to note that seeking individual damages in a petition alleging a derivative action is not fatal to that cause of action. See, e.g., *Chambrella v. Rutledge*, 69 Haw. 271, 740 P.2d 1008 (1987). See, generally, 13 Fletcher, *supra*, § 6011 at 279 ("[w]hen a plaintiff pleads multiple theories of relief, the assertion of one theory does not necessarily imply or amount to waiver of any other theory").

Under our former system of code pleading, the nature of an action is determined not by the prayer for relief but from the character of the facts alleged. *Waite v. Samson Dev. Co.*, 217 Neb. 403, 348 N.W.2d 883 (1984). (The petitions in these cases were filed prior to the effective date of the Nebraska Rules of Pleading in Civil Actions. See Neb. Ct. R. of Pldg. in Civ. Actions 1 (rev. 2004).) The prayer of a petition is not a part of the allegations of fact constituting the cause of action; thus, where the facts alleged state a cause of action and are supported by the evidence, the

court will grant proper relief, although it may not conform to the relief requested. *Bowman v. City of York*, 240 Neb. 201, 482 N.W.2d 537 (1992). A prayer for general relief in an equity action is as broad as the pleadings, and the equitable powers of the court are sufficient to authorize any judgment to which a party is entitled under the pleadings and the evidence. *Sullivan v. General United Life Ins. Co.*, 209 Neb. 872, 312 N.W.2d 277 (1981). The prayer is not part of the pleading, tenders no issue, and neither adds to nor takes from the evidence required of either party. *Standard Reliance Ins. Co. v. Schoenthal*, 171 Neb. 490, 106 N.W.2d 704 (1960).

Consequently, while the ad damnum clauses of Trieweiler's petitions sought individual damages, even had that request not been made in the alternative, Trieweiler's standing to maintain a derivative action would not have been undermined. A derivative action sounds in equity, and a court may rely on a general prayer for relief for the purpose of granting the relief to which the plaintiff is actually entitled. See *Chambrella, supra.*

In short, the appellants' second assignment of error is based on a misrepresentation of Trieweiler's petitions and would have been meritless regardless.

SEARS' JOINT LIABILITY

The next assignment of error we address is the appellants' contention that Sears should not have been found jointly and severally liable. We first consider the argument that Sears should not have been held jointly liable for Campagna's alleged misappropriations from Varsity Investments. The appellants argue that any liability found to result from Campagna's misappropriation should be borne by Campagna alone. The record does not support a finding that Sears participated in or intentionally abetted any of Campagna's alleged misappropriation. Consequently, the question is whether Sears' failure to supervise the affairs of Varsity Investments rose to the level of a breach of Sears' fiduciary duty toward the corporation and its stockholders. See, generally, *Department of Banking v. Colburn*, 188 Neb. 500, 198 N.W.2d 69 (1972).

An officer or director of a corporation occupies a fiduciary relation toward the corporation and its stockholders and is

treated by the courts as a trustee. *Woodward v. Andersen*, 261 Neb. 980, 627 N.W.2d 742 (2001). An officer or director must comply with the applicable fiduciary duties in his or her dealings with the corporation and its shareholders. See *Doyle v. Union Ins. Co.*, 202 Neb. 599, 277 N.W.2d 36 (1979). Where a director has acted in complete good faith and breached no fiduciary duties, he or she is not liable for mere mistakes in judgment. See *id*. However, a violation by a trustee of a duty required by law, whether willful, fraudulent, or resulting from neglect, is a breach of trust, and the trustee is liable for any damages proximately caused by the breach. See *id*. Directors should have a general knowledge of the manner in which the corporate business is conducted, and, where the duty of knowing exists, ignorance because of neglect of duty on the part of a director creates the same liability as actual knowledge and failure to act on that knowledge. *Id*. In addition, Neb. Rev. Stat. § 21-2095 (Reissue 1997) provides, in relevant part:

(1) A director shall discharge his or her duties as a director, including his or her duties as a member of a committee:

(a) In good faith;

(b) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and

(c) In a manner he or she reasonably believes to be in the best interests of the corporation.

(2) In discharging his or her duties, a director shall be entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, if prepared or presented by:

(a) One or more officers or employees of the corporation whom the director reasonably believes to be reliable and competent in the matters presented;

. . . .

(3) A director shall not be considered to be acting in good faith if he or she has knowledge concerning the matter in question that makes reliance otherwise permitted by subsection (2) of this section unwarranted.

(4) A director shall not be liable for any action taken as a director, or any failure to take any action, if he or she performed the duties of his or her office in compliance with this section.

Admittedly, the evidence in this case does not indicate that Sears was informed about the affairs of Varsity Investments. By Sears' own admission, he did not review the books or records of the corporation, or ask to do so, and visited the Varsity Sports Café only once, when it opened.

However, the record also establishes that Trieweiler's letter to Sears, sent in February 1995, did not contain the allegations of substantial misappropriation that would later come to form the basis of this litigation. At that time, Trieweiler was aware that some of the corporation's bills had not been paid and that a check issued by Campagna had been entered improperly in the corporate checkbook. Trieweiler had, at that time, not been provided with desired access to the corporate records. Sears confirmed his awareness of the corporation's difficulty covering expenses, stating that he had been informed by Campagna. The record does not establish, however, that prior to this litigation, Sears was aware of any evidence of misappropriation or missing revenue.

Of course, that conclusion begs the pertinent question: Did Sears breach a fiduciary duty by failing to monitor the corporation's affairs closely enough to make himself aware of any improprieties? Most state statutes now provide, as does Nebraska's, that the degree of care required of a director is the degree of care an ordinarily prudent person would exercise in a like position under similar circumstances. See, § 21-2095; 3A William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations § 1032 (perm. ed., rev. vol. 2002 & Cum. Supp. 2004). An ordinarily prudent person "in a like position" has been interpreted to mean an ordinarily prudent person who was the director of the particular corporation. 3A Fletcher, *supra*; 2 Model Business Corporation Act Annotated § 8.30(b) (3d ed. 2002). The phrase "under similar circumstances" has been interpreted to mean that a court should take account of the director's responsibilities in the corporation, the information available at the time, and the special background knowledge or expertise the director has. *Id.*

An "outside director" is usually defined as one who is neither an officer nor an employee of the corporation. 3A Fletcher, *supra*, § 1035.20, citing *Rowen v. Le Mars Mut. Ins. Co. of Iowa*, 282 N.W.2d 639 (Iowa 1979). The degree of care

for directors based on that which a prudent person in a like position under similar circumstances would give has been said to accommodate the various levels of director involvement in management; by depending on custom and usage, the standard protects the outside director from the expectation that he or she will give his or her undivided attention to corporate interests. See, generally, 18B Am. Jur. 2d *Corporations* § 1710 (1985 & Cum. Supp. 2003), citing Michele Healy Ubelaker, *Director Liability Under the Business Judgment Rule: Fact or Fiction?*, 35 Sw. L.J. 775 (1981). See, generally, Donald E. Pease, *Outside Directors: Their Importance to the Corporation and Protection From Liability*, 12 Del. J. Corp. L. 25 (1987).

While outside directors may not "close their eyes" to the conduct of corporate affairs, at least until they have reason to suspect impropriety, they may within reasonable limits rely on those who have primary responsibility for the corporate business. 3A Fletcher, *supra*, citing *Rowen, supra*. But lack of knowledge is not necessarily a defense, if it is the result of an abdication of directorial responsibility. See *Joy v. North*, 692 F.2d 880 (2d Cir. 1982). See, also, *F.D.I.C. v. Bierman*, 2 F.3d 1424 (7th Cir. 1993).

> In the last analysis, the question of whether a corporate director has become liable for losses to the corporation through neglect of duty is determined by the circumstances. If he [or she] has recklessly reposed confidence in an obviously untrustworthy employee, has refused or neglected cavalierly to perform his [or her] duty as a director, or has ignored either willfully or through inattention obvious danger signs of employee wrongdoing, the law will cast the burden of liability upon him [or her].

> [But] we know of no rule of law which requires a corporate director to assume, with no justification whatsoever, that all corporate employees are incipient law violators who, but for a tight checkrein, will give free vent to their unlawful propensities.

*Graham, et al. vs. Allis-Chalmers Mfg. Co., et al.*, 41 Del. Ch. 78, 85-86, 188 A.2d 125, 130-31 (Del. Supr. 1963). The balancing of these factors must be on a case-by-case basis, depending upon the circumstances at the time of the challenged action or inaction. *Rowen, supra.*

As previously noted, Sears did not have day-to-day responsibilities in the management of the corporation. The record is less than conclusive with respect to whether Sears was an officer of the corporation, as the following colloquy from Sears' direct examination by Trieweiler's counsel demonstrates:

[Trieweiler's counsel]. Were you an officer of Varsity Investments, Inc.?

[Sears]. I believe I was. I'm really not sure.

Q. Do you know what position you were — you held in Varsity Investments, Inc.?

A. Not exactly without looking. Probably a vice president, I would guess. I don't know.

Q. So you believe you would have been a vice president?

A. It would be as good a guess as any.

Q. Do you know what time frame you would have been a vice president of Varsity Investments, Inc.?

A. From the formation of the corporation.

Q. Until the present day?

A. Yeah.

We conclude, based upon the record presented to us, that the district court did not err in concluding that Sears breached a fiduciary duty by failing to closely monitor Varsity Investments' affairs. Admittedly, Sears owned only 10 percent of the corporation and was not at all involved in the operation of the business, and his direct involvement had apparently not been contemplated by the other shareholders. It was clear to all concerned, from the outset, that Sears' primary role was to provide investment capital.

But it is not disputed that Sears, as a director of the corporation, had a fiduciary duty to the corporation and the other shareholders, and it is difficult to see how he could have fulfilled that duty by exercising no meaningful supervisory role whatsoever. A duty which required neither action nor attention to fulfill would not be a duty at all. In this case, Sears' inattention to corporate affairs was so profound that he could not even state, with certainty, whether or not he was an officer of the corporation. Even if Sears was an "outside director" and was not required to give Varsity Investments his undivided attention, the record here presents a textbook example of a director who "closed his eyes" to

the conduct of the corporation. See *Rowen v. Le Mars Mut. Ins. Co. of Iowa*, 282 N.W.2d 639 (Iowa 1979).

Furthermore, we can find no error in the district court's conclusion that Sears' breach of fiduciary duty was the proximate cause of financial losses by Varsity Investments. Sears was an experienced businessperson, having been operator, director, and officer of Sound Recorders, Inc., and director and president of American Gramophone Records. Had Sears devoted even a minimally appropriate degree of attention to corporate affairs, he might have observed that the corporation's finances were in disarray and that adequate records of corporate income were not being maintained. Furthermore, assuming for purposes of this analysis that Campagna misappropriated funds, Sears' proper execution of his fiduciary duties would have required him to determine whether Campagna had properly deposited or spent the corporation's unrecorded income. In other words, Sears' inattention to his fiduciary duties had a proximate causal connection with the mismanagement of and alleged misappropriation from Varsity Investments. The district court did not err in holding Sears to be jointly and severally liable for that mismanagement and misappropriation.

We next address the other aspect of Sears' joint liability—whether Sears was correctly found to be jointly and severally liable for damages from the diversion of the Varsity West opportunity. It is not disputed that the appellants acted together in pursuing the Varsity West project. The appellants have disputed that Varsity West was a corporate opportunity of Varsity Investments. For reasons that will be explained below, we reject the appellants' argument in that respect. For purposes of the current discussion, it suffices to state that Varsity West was an usurped corporate opportunity of Varsity Investments. Given that assumption, Sears argues that instead of being held jointly liable, the appellants should each have been held liable only for the proceeds that each of them actually received from the Varsity West sale.

The appellants simply argue a conclusion in that respect; they offer nothing in the way of legal analysis to advance their argument. But they have placed the issue before this court, and resolving it requires us to consider some of the fundamental principles of equitable relief.

Sears' position is supported by the fact that the traditional remedy imposed by courts upon a finding of a misappropriation of a corporate opportunity is the impression of a constructive trust in favor of the corporation upon the property. *Anderson v. Bellino*, 265 Neb. 577, 658 N.W.2d 645 (2003). See, generally, 3 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations § 861 (perm. ed., rev. vol. 2002 & Cum. Supp. 2004). A constructive trust is a relationship, with respect to property, subjecting the person who holds title to the property to an equitable duty to convey it to another on the ground that his or her acquisition or retention of the property would constitute unjust enrichment. *Manker v. Manker*, 263 Neb. 944, 644 N.W.2d 522 (2002); *ProData Computer Servs. v. Ponec*, 256 Neb. 228, 590 N.W.2d 176 (1999). See, also, *Mischke v. Mischke*, 253 Neb. 439, 571 N.W.2d 248 (1997). Regardless of the nature of the property upon which the constructive trust is imposed, a party seeking to establish the trust must prove by clear and convincing evidence that the individual holding the property obtained title to it by fraud, misrepresentation, or an abuse of an influential or confidential relationship and that under the circumstances, such individual should not, according to the rules of equity and good conscience, hold and enjoy the property so obtained. *Manker, supra*; *Ponec, supra*.

Intangible property and liquid assets such as stocks and bank and investment accounts may be held subject to a constructive trust. *Ponec, supra*. However, where money is the asset upon which the constructive trust is based, it is necessary that the specific amounts be identified and located, either by tracing the money to a specific and existing account, or where the funds have been converted into another type of asset such as by the purchase of real property, the money must be traced into the item of property. *Ponec, supra*; *Chalupa v. Chalupa*, 254 Neb. 59, 574 N.W.2d 509 (1998).

Consequently, the concept of joint liability is, to some extent, inconsistent with the concept of a constructive trust. A constructive trust is imposed in order to prevent unjust enrichment, and in instances in which the law imposes a constructive trust, the doctrine of unjust enrichment generally governs the substantive rights of the parties. See *Barnes v. Eastern & Western Lbr.*

*Co.*, 205 Or. 553, 287 P.2d 929 (1955). Unjust enrichment requires restitution, see *Ahrens v. Dye*, 208 Neb. 129, 302 N.W.2d 682 (1981), which measures the remedy by the gain obtained by the defendant, and seeks disgorgement of that gain. See, *State ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142 (Iowa 2001); *Burch & Cracchiolo, P.A. v. Pugliani*, 144 Ariz. 281, 697 P.2d 674 (1985) (en banc). In other words, when damages are based upon unjust enrichment, a defendant is liable only to the extent of the enrichment. See *Natl. City Bank, Norwalk v. Stang*, 84 Ohio App. 3d 764, 618 N.E.2d 241 (1992).

Joint liability, however, may render each liable party individually responsible for the entire obligation, regardless of what proportion of the plaintiff's damages was caused by each defendant. See, e.g., *Lackman v. Rousselle*, 257 Neb. 87, 596 N.W.2d 15 (1999). In that instance, damages are measured by the plaintiff's loss and seek to provide compensation for that loss. See *Unisys Corp., supra.* Thus, for instance, an action for unjust enrichment differs at common law from tortious conversion primarily on the basis that all the defendants may be held jointly liable in tort, while only those who have benefited are liable, and then only to the extent thereof, in an action for unjust enrichment. *Myzel v. Fields*, 386 F.2d 718 (8th Cir. 1967). This supports a conclusion that joint and several liability is inappropriate in relation to the equitable remedy of a constructive trust. See *A. T. Kearney, Inc. v. INCA International*, 132 Ill. App. 3d 655, 477 N.E.2d 1326, 87 Ill. Dec. 798 (1985). See, also, *Barnes, supra.*

The countervailing principle, however, is the general rule that an act done by the joint agency or cooperation of several persons renders them jointly and severally liable. See *English v. Bruin Engineering, Inc.*, 201 Neb. 791, 272 N.W.2d 753 (1978). All persons who knowingly aid or participate in committing a breach of trust will be held responsible for the resulting loss, and will be held accountable by personal judgment for the value of the property so converted. *Vogt v. Town & Country Realty of Lincoln, Inc.*, 194 Neb. 308, 231 N.W.2d 496 (1975).

Based on that general principle, it has been held that directors and officers of a corporation are jointly as well as severally liable if they jointly participate in a breach of fiduciary duty, or approve of, acquiesce in, or conceal a breach by a fellow officer

or director. See, generally, 3 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations § 1002 (perm. ed., rev. vol. 2002 & Cum. Supp. 2004). See, e.g., *Radol v. Thomas*, 772 F.2d 244 (6th Cir. 1985); *Lawson v. Baltimore Paint and Chemical Corporation*, 347 F. Supp. 967 (D. Md. 1972); *Resolution Trust Corp. v. Block*, 924 S.W.2d 354 (Tenn. 1996); *Christner v Anderson, Nietzke*, 433 Mich. 1, 444 N.W.2d 779 (1989); *Chelsea Industries, Inc. v. Gaffney*, 389 Mass. 1, 449 N.E.2d 320 (1983); *Seaboard Industries, Inc. v. Monaco*, 442 Pa. 256, 276 A.2d 305 (1971); *Knox Glass Botl. Co. v. Underwood*, 228 Miss. 699, 89 So. 2d 799 (1956).

In this case, however, the appellants acted jointly to breach their fiduciary duties by diverting a corporate opportunity from Varsity Investments. That opportunity has been liquidated, and the proceeds divided among the participants, including the appellants. Diversion of a corporate opportunity is generally remedied by the imposition of a constructive trust, the theory of which is inconsistent with joint liability, yet joint liability is indicated by the appellants' cooperation to breach their fiduciary duties.

We conclude that despite the tension between joint liability and the theory of unjust enrichment, the district court did not err in holding the appellants jointly and severally liable in this case. Equity is not a rigid concept, and its principles are not applied in a vacuum, but instead, equity is determined on a case-by-case basis when justice and fairness so require. *Manker v. Manker*, 263 Neb. 944, 644 N.W.2d 522 (2002). Where a situation exists which is contrary to the principles of equity and which can be redressed within the scope of judicial action, a court of equity will devise a remedy to meet the situation. *Anderson v. Bellino*, 265 Neb. 577, 658 N.W.2d 645 (2003). Where relief may be granted, although no precedent may be found, the court will so proceed. *State ex rel. Stenberg v. Moore*, 253 Neb. 535, 571 N.W.2d 317 (1997).

We see little reason to distinguish between the diversion of a corporate opportunity and any other jointly executed breach of fiduciary duty in determining whether defendants are jointly liable for damages resulting from the breach. There would be no sound basis in logic or public policy for concluding that defendants are not jointly liable for diverting a corporate opportunity, yet jointly

liable for theft or mismanagement. Such a distinction, while conceivable, would be based in a technical understanding of equitable relief. But technicalities are not favorites of law or equity; courts relish them as instruments to prevent injustice, not to defeat justice. *Miller v. School Dist. No. 69*, 208 Neb. 290, 303 N.W.2d 483 (1981). Equity looks through forms to substance; thus, a court of equity goes to the root of the matter and is not deterred by forms. *Dillon Tire, Inc. v. Fifer*, 256 Neb. 147, 589 N.W.2d 137 (1999); *Hall v. Hall*, 238 Neb. 686, 472 N.W.2d 217 (1991). Where the defendants have acted jointly to breach their fiduciary duties, the risk that any one defendant will be unable to satisfy his or her proportion of liability should be borne by the other wrongdoers, not the wronged party. Equity will always strive to do complete justice. *State ex rel. Beck v. Associates Discount Corp.*, 162 Neb. 683, 77 N.W.2d 215 (1956). The controlling objective is to make the plaintiff whole. Cf., *Capital Investors v. Executors of Morrison's Estate*, 800 F.2d 424 (4th Cir. 1986); *Seaboard Industries, Inc. v. Monaco*, 442 Pa. 256, 276 A.2d 305 (1971); *Barnes v. Eastern & Western Lbr. Co.*, 205 Or. 553, 287 P.2d 929 (1955).

The district court did not err in holding the appellants to be jointly and severally liable, with respect to either misappropriation from Varsity Investments or usurping the corporate opportunity of Varsity West. The appellants' third assignment of error is without merit.

## TRIEWEILER'S DAMAGES

As previously noted, the court entered a total judgment in favor of Trieweiler, in an individual capacity, in the amount of $105,759. The appellants claim that if damages were to be awarded, the court erred in awarding those damages individually to Trieweiler, as opposed to Varsity Investments, the interests of which Trieweiler represents in this derivative proceeding. We note that Trieweiler's brief does not appear to take issue with this assignment of error, at least with respect to the "forced distribution" of the corporation's recovery from the appellants. Nonetheless, in the absence of an express concession by Trieweiler, we must explain our reasoning with respect to this assignment of error.

The appellants correctly state that in a derivative proceeding, the plaintiff acts in a representative capacity for the corporation, and any recovery is obtained in the name of the corporation.

See *Meyerson v. Coopers & Lybrand*, 233 Neb. 758, 448 N.W.2d 129 (1989). See, generally, 13 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations § 6028 (perm. ed., rev. vol. 1995). It is only where the injury to the plaintiff's stock is peculiar to him or her alone, such as in an action based on a contract to which the shareholder is a party, or on a fraud affecting him or her directly, and does not fall alike upon other shareholders, that the shareholder may recover as an individual. *Meyerson, supra.*

The court, before entering judgment, recognized these general principles. The court stated that "[a]n award in favor of Varsity Investments, Inc. and against . . . Campagna for misappropriation and . . . Sears for breach of fiduciary duty, jointly and severally, in the amount of $168,000.00 would be proper." But the court went on to state:

> However, under the circumstances, due to the efforts that . . . Trieweiler had to go to take [sic] to establish these claims and because he is the only shareholder not involved in the wrongdoing shown by the evidence in these actions, an award of $105,759.00 in favor of . . . Trieweiler should be entered. This award ought to be paid directly to and/or collected for the benefit of . . . Trieweiler without regard to the interests of the two remaining shareholders . . . and without regard to the claims of any other persons or entities. This sum includes [Trieweiler's] claim as a 30% shareholder to the Varsity Sports assets misappropriated by Campagna of $168,000.00; and to his $16,000.00 individual claim at Varsity Sports; and to his interest in the proceeds of the two sales — $12,633.75 and $26,725.25

This court has, in the past, recognized that an action raising a derivative claim may, in the case of a closely held corporation, be treated as a direct action for purposes of recovering damages. See *Anderson v. Clemens Mobile Homes*, 214 Neb. 283, 333 N.W.2d 900 (1983). In *Anderson*, we concluded that the trial court had not erred in permitting a minority shareholder a direct recovery from the majority shareholder whom the court found to have misappropriated funds from the corporation. See *id.*

But in *Anderson*, we did not completely set forth our reasons for that conclusion, or establish any criteria for determining when,

in a case involving a closely held corporation, a direct recovery might be within the court's discretion. The American Law Institute (ALI), however, has promulgated a rule for such circumstances that we find to be persuasive:

> In the case of a closely held corporation . . . the court in its discretion may treat an action raising derivative claims as a direct action, exempt it from those restrictions and defenses applicable only to derivative actions, and order an individual recovery, if it finds that to do so will not (i) unfairly expose the corporation or defendants to a multiplicity of actions, (ii) materially prejudice the interests of creditors of the corporation, or (iii) interfere with a fair distribution of the recovery among all interested parties.

2 American Law Institute, Principles of Corporate Governance: Analysis and Recommendations § 7.01(d) at 17 (1994).

The ALI rule was, when proposed, a consolidation of decisions generally holding that the special case of a closely held corporation justifies an exception to the general rule that only a derivative action may be used to seek redress of corporate injuries. See *id.* The basis for this reasoning is that a closely held corporation may be treated, in effect, as an incorporated partnership, and a significant difference in legal treatment is unwarranted, as the concept of a corporate injury that is distinct from any injury to the shareholders approaches the fictional in the case of a firm with only a handful of shareholders. *Id.*

Since its promulgation by the ALI, § 7.01(d) has been adopted by a number of courts. See, e.g., *Mynatt v. Collis*, 274 Kan. 850, 57 P.3d 513 (2002); *Aurora Credit Services v. Liberty West*, 970 P.2d 1273 (Utah 1998); *Barth v. Barth*, 659 N.E.2d 559 (Ind. 1995); *Derouen v. Murray*, 604 So. 2d 1086 (Miss. 1992); *Schumacher v. Schumacher*, 469 N.W.2d 793 (N.D. 1991). Likewise, we conclude that these principles are helpful to our analysis of the instant case. We hold that in the case of a closely held corporation, a court in its discretion may permit an individual recovery to the plaintiff in an action raising derivative claims, if it finds that to do so will not unfairly expose the corporation or defendants to a multiplicity of actions, materially prejudice the interests of creditors of the corporation, or interfere with a fair distribution of the recovery among all interested persons.

Applying those principles to the instant case, we conclude, on our de novo review, that those criteria are met in this case and that the district court did not err in permitting Trieweiler an individual recovery against the appellants. There is no indication in the record that permitting Trieweiler a direct recovery will lead to a multiplicity of actions or interfere with a fair distribution of any recovery from the appellants. Nor does the record suggest that there are creditors of the corporation whose interests will be prejudiced by Trieweiler's recovery, as the debts evidenced in the record were paid from the proceeds of the sales of the Varsity Sports Café and Varsity West. Consequently, the court acted within its discretion in permitting Trieweiler an individual recovery.

The appellants are, however, correct in arguing that the court erred in awarding Trieweiler $16,000 for "unpaid wages." Trieweiler's operative petitions do not seek recovery for any unpaid wages. Evidence was presented as to the value of services Trieweiler rendered to the corporation during construction and startup, but that evidence was not intended to support a claim for unpaid wages, as the following colloquy demonstrates:

[Trieweiler's counsel]. Did you — did you keep track of the value of the services that you provided during the construction and start-up of the Varsity Sports Cafe on 302 South 11th Street?

[Trieweiler]. Yes, I did.

[Trieweiler's counsel]. And what did you determine the value of those services to be?

[Appellants' counsel]. Objection, no foundation, irrelevant.

THE COURT. Is there a suit for lost wages or the value of work performed?

[Appellants' counsel]. I think it goes to consideration for the stock.

THE COURT. Okay.

As previously noted, a party will not be permitted to plead one cause of action and upon trial rely upon proof establishing another. *Abdullah v. Nebraska Dept. of Corr. Servs.*, 246 Neb. 109, 517 N.W.2d 108 (1994). Proof must correspond with the allegations in the pleadings, and relief cannot be granted upon proof of a cause substantially different from the case made in the

pleadings. *Id.* Based upon these principles, we conclude that the court erred in awarding Trieweiler damages for unpaid wages. The court's judgment will be modified to remove that award.

## EVIDENCE OF DAMAGES

The appellants present several overlapping arguments with respect to Trieweiler's evidence of damages. Much of this argumentation rests on the appellants' contention that the testimony of Trieweiler's expert witness, Anderson, was without sufficient foundation, and that issue will form the core of this section of our analysis. First, however, we will dispose of some of the appellants' other contentions.

The appellants first argue that Trieweiler's case should have failed because he failed to present sufficient evidence of lost profits. The appellants argue that since Trieweiler failed to present evidence of net profits, there was not enough evidence to support an award of damages. See, e.g., *Pribil v. Koinzan,* 266 Neb. 222, 665 N.W.2d 567 (2003); *Home Pride Foods v. Johnson,* 262 Neb. 701, 634 N.W.2d 774 (2001); *World Radio Labs. v. Coopers & Lybrand,* 251 Neb. 261, 557 N.W.2d 1 (1996); *Katskee v. Nevada Bob's Golf of Neb.,* 238 Neb. 654, 472 N.W.2d 372 (1991). In a related argument, the appellants contend that Trieweiler was required to present evidence of the corporate tax liability that would have been incurred had the corporation actually received the assets that the court found had been misappropriated.

These arguments, however, are premised on a misunderstanding of the basis of Trieweiler's lawsuit. Trieweiler brought a derivative action on behalf of the corporation, and the corporation's recovery from the appellants is not based on lost or prospective profits. See *Pribil, supra* (explaining distinction between present and prospective damages). In *Home Pride Foods, supra,* for instance, the plaintiff sought to recover for revenues that it allegedly *would* have earned had the defendant not acquired the plaintiff's secret customer list. Compare, also, *World Radio Labs., supra; Katskee, supra.* In this case, however, the plaintiff sought to recover for revenues that actually *were* earned, but allegedly misappropriated; the corporation is entitled to recover assets that were misappropriated from it because of the appellants' breaches

of their respective fiduciary duties. In other words, the plaintiff's recovery is measured by the value of the assets that were misappropriated. Evidence of the value of the misappropriated assets was all that Trieweiler was required to present to support his claim for damages.

The appellants also argue that in assessing damages for the diversion of the Varsity West corporate opportunity, the court erred in failing to consider that Jeff Sears received 39 percent of the net proceeds of the Varsity West sale and that "[n]either Trieweiler nor Varsity [Investments] had any claim against the proceeds received by Jeff Sears." Brief for appellant Sears at 27. This assertion is pointedly incorrect. The corporate opportunity doctrine rests on the assumption that a business opportunity may "belong" to a corporation. If a director of the corporation breaches his or her fiduciary duty to the corporation to usurp that opportunity, the corporation is entitled to recover for that loss. See, generally, *Electronic Development Co. v. Robson*, 148 Neb. 526, 28 N.W.2d 130 (1947). The fact that the proceeds from the usurpation may have ended up in the hands of an innocent party does not defeat the corporation's right to recover from those whose breaches of fiduciary duty occasioned the loss.

Stated more simply, the fact that a director stole valuable assets from a corporation and gave those assets to a presumably innocent third party does not change the fact that the assets properly belonged to the corporation in the first place and that the corporation should be compensated for the theft by the wrong-doer. A gratuitous transfer of unlawfully obtained property does not defeat the victim's right to recover its losses. Consequently, Varsity Investments may recover the value of any corporate opportunity that was diverted from it, regardless of who else may have profited. See *Anderson v. Bellino*, 265 Neb. 577, 658 N.W.2d 645 (2003) (director ordered to pay "expenses" of new corporation, such as salary to wife and sponsorship of son's racing team, that would not have been incurred had director not usurped corporate opportunity from former corporation).

Underlying most of the appellants' argument on damages, however, is the appellants' contention that Anderson's expert testimony lacked foundation and should not have been relied upon by the district court. It is unclear whether the appellants'

contention is directed at the admissibility of Anderson's testimony, the weight it should have been given, or both. We assume that the appellants are arguing that the testimony should have been neither admitted nor found credible.

The appellants' arguments are again undermined by their failure to distinguish the circumstances of the instant case from cases involving lost profits or other types of prospective damages. See *Pribil v. Koinzan*, 266 Neb. 222, 665 N.W.2d 567 (2003). We have held in those cases that the trier of fact "is to award such damages only where the evidence shows that the *future* earnings . . . for which recovery is sought are 'reasonably certain' to occur." (Emphasis supplied.) *Id.* at 228, 665 N.W.2d at 573. This is not such a case.

Furthermore, the appellants appear to assume that Trieweiler bore the entire burden of proof in this proceeding. However, as previously stated, an officer or director of a corporation occupies a fiduciary relation toward the corporation and its stockholders and is treated by the courts as a trustee. *Woodward v. Andersen*, 261 Neb. 980, 627 N.W.2d 742 (2001). Although the burden of proof is ordinarily upon the party seeking an accounting to sustain the accounting, when another person is in control of the books and has managed the business, that other person is in the position of a trustee and must make a proper accounting. *Id.* Here, the evidence establishes that Campagna had control of the books of the corporation and managed the business and that Sears had a duty to examine Campagna's conduct; it was the appellants' burden to account for the corporation's revenues and the disposition of its assets. See, *Anderson v. Clemens Mobile Homes*, 214 Neb. 283, 333 N.W.2d 900 (1983); *Howell v. Poff*, 122 Neb. 793, 241 N.W. 548 (1932).

The appellants failed in that burden. The primary purpose of Anderson's testimony was to establish that the records retained by Varsity Investments were incomplete. The district court found Anderson's testimony persuasive on that point and stated:

> A presumption that the missing, lost or destroyed records contained information helpful to [Trieweiler] and damaging to each of the [appell]ants, arises by virtue of the failure of [the appellants] to maintain complete books and records of the Corporation, including daily sales sheets, when on notice

of the claims involved in these actions; and by virtue of the failure of [the appellants] to make and keep books and records of the Corporation during its operation of the Varsity Sports Café.

The district court's reasoning is supported by the rule of spoliation, or intentional destruction of evidence. See *State v. Davlin*, 263 Neb. 283, 639 N.W.2d 631 (2002). When intentional destruction of evidence is established, the fact finder may draw the inference that the evidence destroyed was unfavorable to the party responsible for its destruction. *Id.*, citing *State v. Langlet*, 283 N.W.2d 330 (Iowa 1979). The instant case does not present a clear case of spoliation, since the record does not clearly establish that Varsity Investments kept financial records that Campagna later *intentionally* destroyed, although there is some evidence in the record to suggest that. But the adverse inference drawn from the destruction of evidence is predicated on bad conduct. *Davlin, supra*, citing *U.S. v. Wise*, 221 F.3d 140 (5th Cir. 2000). Intentional destruction is said to indicate fraud and a desire to suppress the truth. See *Davlin, supra*, citing *Jackson v. State*, 791 So. 2d 830 (Miss. 2001).

Here, the record does not clearly establish intentional *destruction* of financial records. But it does establish an intentional breach of a fiduciary duty to maintain such records, which also may be indicative of fraud and a desire to suppress the truth, particularly when, as the district court noted, adequate financial records were not maintained despite notice of Trieweiler's claims against the appellants. " 'Such seemingly careless concern for records at a time when they were being requested . . . would clearly support the inference that the information contained therein would be harmful to the defendants.' " *Yoffe v. United States*, 153 F.2d 570, 574 (1st Cir. 1946).

It is with these presumptions in mind that we turn to the gravamen of the appellants' complaint: Anderson's testimony did not establish that Campagna misappropriated money, or what amounts of money were missing. As the district court stated, "[a]t this juncture, no one, other than Campagna can ever know, or ascertain with precision, the extent to which funds were diverted from this business." That appears to be exactly the point upon which the appellants are relying.

Nonetheless, we conclude that Anderson's testimony and his attempt to reconstruct Varsity Investments' finances from fragmentary records are sufficiently reliable to establish that the appellants have failed to account for revenue that was earned by the corporation. In particular, Anderson's comparison of Varsity Investments' tax returns with the (accidentally) available computer records showed net sales for which no accounting was made. Anderson compared daily sales calculations with regular bank deposits and concluded that sales significantly exceeded deposits; no other accounting was made of that revenue. As the court noted, and our statement of facts reflects, Campagna failed to explain either much of this revenue or deposits into his personal bank accounts, and the court found the explanations he did offer to be contradictory and unpersuasive. See *Drew v. Walkup*, 240 Neb. 946, 486 N.W.2d 187 (1992) (on de novo review, appellate court may consider that trial court heard and saw witnesses and found one version of facts more credible than another).

The appellants' complaints about specific items that they claim Anderson should have considered disregard this simple fact: It was the *appellants'* burden to account for corporate revenues, and Anderson's testimony was not required to establish to the penny how much money was earned and where it ended up—rather, once Anderson established with reasonable certainty that the corporation's records were incomplete, it was the appellants' burden to make a proper accounting to the shareholders.

Furthermore, while the appellants complain about Anderson's testimony, they offered no expert testimony of their own to explain their view of the evidence or to provide an alternative means of evaluating the record. While the appellants find fault with detailed aspects of Anderson's testimony, they did not present any expert testimony of their own to support their assertion that Anderson's methodology was unreliable. Anderson's testimony, whatever its faults, was the only instrument made available to the district court or to this court to assist us in navigating through and making sense of thousands of pages of testimony and evidence.

Anderson conceded that his analysis would have been more complete and precise had certain types of financial records been available to him. But this imprecision was necessitated by the wrongful conduct of the appellants.

"[A] defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible. . . . The wrongdoer should bear the risk of uncertainty that his [or her] own conduct has created."

*Lakota Girl Scout C., Inc. v. Havey Fund-Rais. Man., Inc.*, 519 F.2d 634, 643 (8th Cir. 1975), quoting *Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556 (2d Cir. 1970). See, also, *C&B Sales & Service, Inc. v. McDonald*, 177 F.3d 384 (5th Cir. 1999); *Marquis Theatre Corp. v. Condado Mini Cinema*, 846 F.2d 86 (1st Cir. 1988), citing *Knightsbridge Marketing v. Promociones Y Proyectos*, 728 F.2d 572 (1st Cir. 1984); *Wolf v. Rand*, 258 A.D.2d 401, 685 N.Y.S.2d 708 (1999). In addressing a similar situation, the *Wolf* court found

no basis to disturb the court's methodology for establishing the diverted profits . . . . Since the breach of fiduciary duty was proved, the court may be accorded significant leeway in ascertaining a fair approximation of the loss . . . as contrasted with the more precise, compensatory, standard of a contract or tort case . . . so long as the court's methodology and findings are supported by inferences within the range of permissibility . . . which is the case herein. After all, "[w]hen a difficulty faced in calculating damages is attributable to the defendant's misconduct, some uncertainty may be tolerated."

(Citations omitted.) 258 A.D.2d at 402-03, 685 N.Y.S.2d at 710, quoting *Whitney v. Citibank, N.A.*, 782 F.2d 1106 (2d Cir. 1986).

Anderson's testimony established that Varsity Investments' revenue had been underreported and that the disposition of that income was not reflected in Varsity Investments' financial records. The appellants contend that Anderson did not consider other factors that "could effect [sic] profitability of the bar operation such as competition, casinos, employee theft, labor costs, costs of goods sold, rent and other factors." Brief for appellant Sears at 31. In fact, Anderson did consider many of these factors, as his calculations included overhead expenses as reported on Varsity Investments'

tax returns. There is also some irony in charging Anderson with overlooking the possibility of "employee theft," given the basis of these proceedings.

But beyond that, once Anderson established that corporate revenues were missing, it was the appellants' burden to account for that income, not Trieweiler's, and certainly not Anderson's. In other words, while Trieweiler presented evidence, through Anderson, to approximate corporate revenues, the burden of approximating costs, and accounting for profits, belonged to the appellants. See *C&B Sales & Service, Inc., supra.* See, also, *Demoulas v. Demoulas Super Markets, Inc.*, 424 Mass. 501, 677 N.E.2d 159 (1997) (wrongdoer responsible for asserting and proving defense of tax deductions). Absent such evidence, we cannot say the district court erred in finding Anderson's calculations of Varsity Investments' lost revenues to be credible and persuasive. As the district court stated, "[f]rom the evidence adduced, one could only conclude that substantial funds were siphoned off from the business, and not reported in any medium . . . ."

We conclude that the appellants' arguments with respect to evidence of damages are without merit. Trieweiler presented credible evidence to establish that corporate revenues were unreported and missing. The appellants had the burden to account for those revenues. They failed to meet that burden, particularly given that their breaches of fiduciary duty deprived Trieweiler, Anderson, and the court of the financial records that should have been available. Although Anderson's reconstruction of Varsity Investments' finances was admittedly imprecise, that imprecision was occasioned by the appellants, and it is they who should bear its risk. The district court did not err in presuming that the financial records the appellants should have been able to produce, but did not, would have contained information unfavorable to the appellants' position in this case.

Consequently, although the record does not allow calculation of Varsity Investments' losses to the penny, the law does not require such specificity. See *C&B Sales & Service, Inc. v. McDonald*, 177 F.3d 384 (5th Cir. 1999). Anderson's testimony provided an approximation of Varsity Investments' damages that

was reasonable given the circumstances. See *id*. The appellants' assignment of error to the contrary is without merit.

CORPORATE OPPORTUNITY

The appellants claim that Varsity West was not a corporate opportunity of Varsity Investments. First, the appellants argue that they acted in good faith and did not harm Varsity Investments. Second, the appellants argue that Varsity Investments was not financially able to pursue the Varsity West venture. We address each argument in turn.

The general rule is that a director or other corporate officer cannot acquire an interest adverse to that of the corporation while acting for the corporation or dealing individually with third persons. *Anderson v. Bellino*, 265 Neb. 577, 658 N.W.2d 645 (2003); *Anderson v. Clemens Mobile Homes*, 214 Neb. 283, 333 N.W.2d 900 (1983). The fiduciary relation is so vital that directors are not only prohibited from making profit out of corporate contracts, and from dealing with the corporation except upon the most open and on the fairest terms, but the rule of accountability is so strict that they are not permitted to anticipate the corporation in the acquisition of property reasonably necessary for carrying out the corporate purposes or conducting the corporate business. *Bellino, supra.*

Consequently, the doctrine of corporate opportunity prohibits one who occupies a fiduciary relationship to a corporation from acquiring, in opposition to the corporation, property in which the corporation has an interest or tangible expectancy or which is essential to its existence. 3 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations § 861.10 (perm. ed., rev. vol. 2002 & Cum. Supp. 2004). Although officers or directors of a corporation are not necessarily precluded from entering into a separate business because it is in competition with the corporation, their fiduciary relationship to the corporation and its stockholders is such that if they do so they must prove that they did so in good faith and did not act in such a manner as to cause or contribute to the injury or damage of the corporation, or deprive it of business; if they fail in this proof, there has been a breach of that fiduciary trust or relationship. *Id*. See *Clemons Mobile Homes, supra.* Therefore, where a corporate

opportunity or self-dealing transaction is disclosed to the corporation, but the decision on it is made by self-interested directors, the burden is on those who benefit from the venture to prove that the decision was fair to the corporation. *Demoulas v. Demoulas Super Markets, Inc.*, 424 Mass. 501, 677 N.E.2d 159 (1997).

The appellants argue that Varsity West was not a corporate opportunity of Varsity Investments, because they acted in good faith and did not injure Varsity Investments. However, these arguments are inconsistent with Nebraska law. The test for whether an opportunity is corporate is whether the business is one of practical advantage to the corporation and fits into and furthers an established corporate policy. *Bellino, supra*; *Clemons Mobile Homes, supra.* Stated another way, this test characterizes an opportunity as corporate whenever a fiduciary becomes involved in an activity intimately or closely associated with the existing or prospective activities of the corporation. If this test is met, usurping that opportunity was necessarily harmful to the corporation. When there is presented a business opportunity which the corporation is financially able to undertake and which, by its nature, falls into the line of the corporation's business and is of practical advantage to it, or is an opportunity in which the corporation has an actual or expectant interest, a fiduciary is prohibited from permitting his or her self-interest to be brought into conflict with the corporation's interest, and may not take the opportunity for himself or herself. 3 Fletcher, *supra*, § 861.20.

The appellants offer no argument, nor would the record support a credible argument, that Varsity West did not fall into Varsity Investments' line of business, or would not have been of practical advantage to the corporation and fit into and furthered established corporate policy. In fact, as found by the district court, the record shows that Varsity West was, as a practical matter, almost indistinguishable from Varsity Investments. The two businesses advertised jointly. Insurance, payroll services, and credit card processing for Varsity West were handled through Varsity Investments' existing operations. Business loan proceeds were cross-collateralized and shared between the two businesses, and Varsity West revenues were used to pay Varsity Investments' debts. As found by the district court,

[t]he two bars were in fact one business enterprise. To recognize a distinction between them, simply because a second corporation was subsequently formed whose title matched existing lease and license applications, would deny the reality of this operation.

. . . They were inextricably bound in one enterprise. No new capital was invested in Varsity West. The concept of the two bars was identical, indeed they were advertised as the same venture. The business that was actually conducted at Varsity West could not have taken place without the oversight and sponsorship of Varsity Sports.

Given the involvement of Varsity Investments in the operation and development of Varsity West, it is difficult to conclude that Varsity West was not a corporate opportunity of Varsity Investments. " 'Obviously, if the corporation['s] funds have been involved in financing the opportunity or its facilities or personnel have been used in developing the opportunity, the opportunity in justice should belong to the corporation.' " *Banks v. Bryant*, 497 So. 2d 460, 465 (Ala. 1986). See, also, *Demoulas v. Demoulas Super Markets, Inc.*, 424 Mass. 501, 677 N.E.2d 159 (1997); *Ault v. Soutter*, 167 A.D.2d 38, 570 N.Y.S.2d 280 (1991); *Billman v. State Deposit Corp.*, 86 Md. App. 1, 585 A.2d 238 (1991); *Paulman v. Kritzer*, 74 Ill. App. 2d 284, 219 N.E.2d 541 (1966), *affirmed* 38 Ill. 2d 101, 230 N.E.2d 262 (1967). See, generally, 3 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations § 861.10 (perm. ed., rev. vol. 2002 & Cum. Supp. 2004).

The intertwining of corporate affairs also undermines the appellants' claim that Varsity Investments was financially unable to pursue the Varsity West development. If a fiduciary uses corporate assets to develop a business opportunity, the fiduciary will be estopped from denying that it was a corporate opportunity, regardless of the corporation's ability to exploit it. 3 Fletcher, *supra*. See, e.g., *Paulman, supra*. In short, it is difficult to believe that Varsity Investments was financially unable to develop Varsity West when, as a practical matter, Varsity Investments *did* develop Varsity West.

Furthermore, while there is authority for the contention that it is immaterial who takes over a corporate opportunity

where a corporation is insolvent or legally disabled from pursuing it, the record in this case does not support the application of that authority.

> The rule thus contended for, so far as we have been able to find, applies only in case the corporation is actually insolvent to such a degree that it cannot carry on business or the corporation is legally disqualified from embracing the opportunity. Financial inability, unless it amounts to insolvency to the point where the corporation is practically or actually defunct, is insufficient to warrant application of the rule. We do not find, from our search, any authority for applying the rule to technical insolvency such as inability to pay current bills when due or where mere inability to secure credit prevails as appears in this case.

*Electronic Development Co. v. Robson*, 148 Neb. 526, 539, 28 N.W.2d 130, 138 (1947). Accord *Nicholson v. Evans*, 642 P.2d 727 (Utah 1982). Corporate financial difficulty short of actual insolvency as defined above is inadequate by itself to exonerate a fiduciary who appropriates an opportunity. *Id.* While the record in this case shows financial difficulties for Varsity Investments, the evidence falls far short of actual insolvency.

Finally, it is difficult to accept the appellants' claims of financial inability when it is not at all clear what the financial condition of the corporation would have been had a proper accounting been made of Varsity Investments' revenues. "The [financial] inability of the corporation to take advantage of the opportunity because of lack of funds may not be relied upon by directors when their own lack of diligence was responsible for the corporation's momentary fiscal condition." *Daloisio v. Peninsula Land Co.*, 43 N.J. Super. 79, 93, 127 A.2d 885, 892 (1956). See, generally, 3 Fletcher, *supra*. Given the circumstances discussed in previous sections of this opinion, we cannot accept the appellants' complaints about the financial condition of the corporation, since that condition was itself the result of the appellants' breaches of fiduciary duties. See *Anderson v. Clemens Mobile Homes*, 214 Neb. 283, 333 N.W.2d 900 (1983).

For the foregoing reasons, we conclude that Varsity West was a corporate opportunity of Varsity Investments that was wrongfully

usurped by the appellants. The appellants' assignment of error to the contrary is without merit.

## ATTORNEY FEES

█ Finally, the appellants argue that the district court erred in ordering them to pay attorney fees. Attorney fees and expenses may be recovered in a civil action only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees. *Simon v. City of Omaha*, 267 Neb. 718, 677 N.W.2d 129 (2004). The only bases upon which Trieweiler sought attorney fees, and the only bases upon which fees were granted, were found in § 21-2076, which provides:

> On termination of the derivative proceeding the court may:
> (1) Order the corporation to pay the plaintiff's reasonable expenses, including attorney's fees, incurred in the proceeding if the court finds that the proceeding has resulted in a substantial benefit to the corporation;
> . . . .
> (3) Order a party to pay an opposing party's reasonable expenses, including attorney's fees, incurred because of the filing of a pleading, motion, or other paper, if the court finds that the pleading, motion, or other paper was not well-grounded in fact, after reasonable inquiry, or warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law and was interposed for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

The court found that both of these provisions applied in the instant case. However, the district court erred in reaching those conclusions.

█ With respect to § 21-2076(1), we first note that because Trieweiler was awarded an individual recovery, there is no evidence to suggest that this action resulted in the "substantial benefit to the corporation" contemplated by the statute. But, even assuming that the proceeding has resulted in a substantial benefit to the corporation, the section simply does not authorize the court to order payment of fees by the appellants. Rather, it

states explicitly that fees may be recovered from the corporation. It is not within the province of the courts to read a meaning into a statute that is not there. *Kubicek v. City of Lincoln*, 265 Neb. 521, 658 N.W.2d 291 (2003). The district court erred in concluding that § 21-2076(1) authorized it to order the appellants to pay attorney fees.

Section 21-2076(3), on the other hand, permits the court to order a party to pay an opposing party's fees. However, the record does not support a finding that Trieweiler incurred fees and expenses "because of the filing of a pleading, motion, or other paper." Section 21-2076(3) is directed at the conduct of litigation, not at the underlying wrongful conduct of the defendants, and the court failed to justify a conclusion that the appellants' legal strategies in defending this lawsuit were not well grounded in fact or warranted by existing law, and were interposed for an improper purpose.

Therefore, we vacate the order of the district court ordering the appellants to pay attorney fees.

## CONCLUSION

The district court judgment finding liability on the part of the appellants, and awarding an individual recovery to Trieweiler, is supported by the record and is generally affirmed. However, the court erred in awarding $16,000 to Trieweiler for unpaid wages, and the court's judgment is modified to the limited extent necessary to remove that award. The court's order awarding attorney fees was in error and is vacated. We pause to note, however, that we recognize the difficulties presented by this case, having confronted some of them ourselves, and although we have concluded that the district court erred in some respects, we take this opportunity to commend the court for its evident consideration and overall diligence in presiding over this complex matter.

AFFIRMED IN PART AS MODIFIED,
AND IN PART VACATED.