IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

FREDERICK V. MERZ

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

DAVID L. FREDERICK AND CAROL FREDERICK, HUSBAND AND WIFE, AND
DOUGLAS E. MERZ, ON BEHALF OF SALEM GRAIN COMPANY, INC.,
A NEBRASKA CORPORATION, APPELLANTS AND CROSS-APPELLEES,
V.
MARY MERZ ET AL., APPELLEES AND CROSS-APPELLANTS.

Filed November 12, 2013.    No. A-12-665.

Appeal from the District Court for Richardson County: DANIEL E. BRYAN, JR., Judge.
Affirmed.

J.L. Spray and Patricia L. Vannoy, of Mattson, Ricketts, Davies, Stewart & Calkins, for appellants.

Terry C. Dougherty and Kari A.F. Scheer, of Woods & Aitken, L.L.P., for appellees.

MOORE, PIRTLE, and BISHOP, Judges.

MOORE, Judge.

## I. INTRODUCTION

David L. Frederick, Carol Frederick, and Douglas E. Merz (collectively the Appellants) filed a complaint in the district court for Richardson County against Mary Merz, Bruce Merz, William R. Duey, and Kay Richter (collectively the Appellees). The Appellants set forth derivative actions on behalf of Salem Grain Company, Inc. (Salem Grain), for breaches of fiduciary duty and duty of loyalty and a third cause of action for tortious interference with a business relationship and expectancy. A bench trial was held, and after the close of the Appellants' case, the court granted the Appellees' motion for directed verdict. The court found that the Appellees breached their fiduciary duty and duty of loyalty to Salem Grain but that the Appellants failed to prove that the breaches caused any damages. The court also found that the Appellants did not prove any elements of tortious interference with a business relationship. On

- 1 -

appeal, the Appellants assign error to the court's findings with respect to damages and their tortious interference claim. The Appellees have cross-appealed and assign error to the court's findings with respect to their breaches of fiduciary duty and duty of loyalty. Because we find no error in the grant of a directed verdict in favor of the Appellees, we affirm.

## II. BACKGROUND

Salem Grain is a Nebraska corporation operating grain facilities in and around Falls City, Nebraska. Salem Grain is a subchapter S corporation, which means that the income flows directly through to the shareholders and the shareholders are responsible for payment of the income tax on the earnings. Accordingly, Salem Grain consistently made distributions to the shareholders of 50 percent of the corporation's net profits for the fiscal year.

Two of the Appellants, David and Carol, are married and have been minority shareholders in Salem Grain since 1997. The third appellant, Douglas, has been a minority shareholder in Salem Grain since 1980 and was a member of the board of directors during the relevant time period.

The Appellees were each minority shareholders and members of Salem Grain's board of directors during the relevant period. At an April 21, 2000, special meeting of Salem Grain's shareholders, a new board of directors was elected. Duey was on the board prior to the April 2000 meeting and was reelected to the board in April 2000. Richter, Bruce, and Mary were first elected as directors at the April 2000 meeting and served continuously until their resignation in November 2001. Following the special shareholders' meeting, a board of directors meeting was convened, and Duey was elected as the board's vice president, Richter as secretary, and Mary as treasurer.

Although not parties to the case, at relevant times, John Seeba and his wife, Rita Seeba, owned shares of Salem Grain. John was Salem Grain's manager and president of the board throughout the relevant period. Rita was also on the board.

The dispute at issue in this appeal involves the sale in 2001 of stock in Salem Grain by a group of shareholders, which included the Appellees, to the Seebas and the obligations the Appellees had with respect to that sale. As will be further detailed below, there were a series of offers and discussions among various persons concerning the sale of the stock.

In their operative complaint, filed on February 13, 2006, the Appellants included a derivative action on behalf of Salem Grain, alleging that the Appellees breached their fiduciary duty and their duty of loyalty to the corporation and its directors and shareholders. The crux of these derivative causes of action was that the Appellants were not advised of the Seebas' independent offer to purchase the stock or given an opportunity to respond and that the Appellees, as directors of Salem Grain, voted to approve certain payments from the corporation as consideration for the stock purchase agreement with the Seebas. The Appellants also included an individual action, alleging that the Appellees "tortuously [sic]" interfered with a business relationship and expectancy of the Appellants with respect to purchasing the stock.

A bench trial was held before the district court on June 25 and 26, 2012. The court received numerous exhibits and heard testimony from witnesses called by the Appellants. At the close of the Appellants' evidence, the Appellees moved for a directed verdict and the court granted the motion.

The Appellants' evidence shows that by January 30, 2001, the Appellees and six additional shareholders (collectively the sellers) decided to sell their shares in Salem Grain. Although the sellers were each minority shareholders, they collectively held approximately 51 percent of the stock in Salem Grain. Prior to offering their shares for sale, the sellers researched how to go about offering their shares for sale and hired an attorney, Michael Dunn, to assist them. One consideration the sellers had in this process was Salem Grain's bylaws, which state, "A stockholder who wishes to sell his stock must first offer it to another existing stockholder of the corporation before selling it to someone outside of the regular stockholders of the corporation unless waived by the Board of Directors." Dunn informed the sellers that the sellers who were members of Salem Grain's board of directors would have a conflict of interest and advised them how to handle that conflict, essentially by abstaining to vote on approval of any transaction or contract.

Dunn drafted a letter, dated January 30, 2001, and addressed to John as president of Salem Grain, concerning the sellers' offer to sell their shares to the corporation or to any remaining shareholder. The letter stated that a group of shareholders holding 51 percent of the outstanding corporate shares were "offer[ing] their shares of stock as a block to the corporation or to any willing remaining shareholder or group of shareholders for the price of $3,600.00 per share." The total purchase price for all the stock offered was $1,096,666.20. The offer letter stated that each of the sellers would pay the tax on their proportionate share of any net profit for the 2000-2001 fiscal year, but that they would require a 50-percent distribution of the net profit of the corporation on or before December 31, 2001, to each shareholder of record as of July 31, 2001. The letter held the offer open for the corporation for 30 days and for an additional 15 days thereafter for any shareholder.

Dunn met with the Seebas on January 30, 2001, to discuss the offer letter. Dunn emphasized that the offer was being presented to John as corporate president and should be shared with all the remaining shareholders. Dunn advised John that the deadlines in the letter may be negotiable if Salem Grain or a group of shareholders was working to finance the transaction. Dunn advised that the offer price was based on the appraisal that had been completed during the administration of the estate of a deceased shareholder and additional information obtained after the appraisal. The price was arrived at with the consent of all of the sellers. Dunn indicated that if the corporation purchased the stock, the Seebas would own 67 percent of Salem Grain's shares, and that if the Seebas purchased the stock, they would own 84 percent of the shares.

John, David, and Douglas sent a counteroffer letter to Dunn dated March 30, 2001, stating that they would be willing to purchase the sellers' shares for $450,000 with a downpayment of only 20 percent and the balance payable over 5 years with interest of 7 percent per year on the unpaid balance. No response to this counteroffer was received from the sellers. One of the sellers, Duey, testified at trial that the sellers did not respond to the counteroffer because "it was an insult."

The sellers eventually began contacting outside parties to see if they could find anyone interested in buying the shares. Although there was some interest from outside parties, the sellers were not able to work out a deal to sell their shares to a third party.

In July 2001, Douglas called Dunn and asked about the status of the March 2001 counteroffer. Dunn told him that the sellers rejected the offer because it was too low and its terms were unrealistic, but Dunn advised Douglas that he was welcome to make a more realistic offer. On July 25, John, David, and Douglas offered to buy the sellers' shares for $550,000. Shortly thereafter, the sellers countered, offering to sell the shares for $950,000 and a 50-percent distribution of net profit for the fiscal year to enable the sellers to pay taxes on their portions of the corporation's profits.

When the sellers did not receive a response to their $950,000 counteroffer, Duey contacted John and encouraged him to make another offer with David and Douglas. Eventually, sometime in September or October 2001, John expressed interest and began talking in earnest about purchasing the shares on his own.

In early October 2001, Douglas called Dunn and said that his group did not have another proposal but that if the sellers had received any acceptable offers, he might be able to get them more money. Douglas claimed that he was representing a "client" and stated that if the sellers received an offer from someone, to let him know what the offer was, because his "client" might be able to pay the sellers more money. Dunn informed Douglas that he did not think the sellers would be "shopping offers around" and that if his group wanted to purchase the shares, they should make an offer right away or they might miss the opportunity.

Finally, the Seebas made an independent offer to buy the sellers' shares. The Seebas' offer, dated October 11, 2001, stated that they would purchase the sellers' stock for $650,000 in cash. The offer also provided the parties would ensure that all of the corporation's shareholders received their usual 50-percent distribution of the net proceeds of the corporation to pay the corporation's taxes, that the employees received their usual yearend bonuses, and that John received his usual 15-percent bonus for his role as manager of Salem Grain.

The sellers sent the Seebas a letter, dated October 19, 2001, accepting their offer. The acceptance letter stated that the transfer would be effective as of August l, 2001, for tax purposes, and that all the shareholders, including the sellers, would be responsible for their pro rata share of the corporation's tax liability for the August 1, 2000, through July 31, 2001, fiscal year. For that reason, dividend distributions to help with the payment of those taxes would be made to all the shareholders of record as outlined in the offer. Subsequently, the terms discussed in the offer and acceptance letters were set out in more detail in the stock purchase agreement, in which the sellers agreed to sell their interest in Salem Grain and the Seebas agreed to purchase the shares from the sellers. The stock purchase agreement contemplated a closing date of November 15, 2001. With respect to consideration, the stock purchase agreement provided:

> In consideration of the Purchased Stock Buyer will pay Seller the aggregate purchase price of [$650,000], payable as set forth below. In addition, prior to the end of the calendar year, the parties will cause the Company to distribute to all shareholders of the Company of record as of July 31, 2001, an amount equal to 50% of the net profit of the Company for the fiscal year which ended on July 31, 2001, for an aggregate distribution of approximately $176,915.57 to all shareholders of the Company on a pro rata basis (such distribution amount takes into account payments of $27,500 in bonuses to employees of the Company, and annual 15% commission payment to John Seeba, both of which the parties shall cause the Company to approve and distribute promptly). Seller

shall pay income taxes on Seller's proportionate share of the Company's net profit for the fiscal year ending July 31, 2001.

Salem Grain's board of directors had a meeting on November 13, 2001. The agenda for the meeting consisted of approval of regular bonuses for employees and commission for the manager, distribution of "Sub-S funds," and "[a]ny other items that might come up for discussion." During the meeting, the board approved a 15-percent commission for John, a $27,500 payout for employee bonuses, and a distribution of 50 percent of the corporation's profit for the fiscal year to all the shareholders, with each of the Appellees voting in favor of these decisions. No other business was conducted; there was no discussion or vote concerning the stock purchase agreement shown in the minutes. Douglas abstained from voting because "there wasn't adequate disclosure of what was going on." The corporate bylaws do not require corporate approval for the sale of stock, unless the corporation is asked to waive the provision that the stock be offered to an existing stockholder prior to being sold to an outsider.

The Appellees all resigned from Salem Grain's board of directors after the November 2011 meeting and effective upon completion of the sale of their stock to the Seebas.

Douglas testified that with respect to offers made by himself, David, and John, they considered buying the stock and then offering it to the corporation. He testified further that the corporation would have been able to borrow money in 2001 to acquire the sellers' stock at the price of $650,000.

Trial testimony from Douglas shows that the 15-percent commission paid to John amounted to $62,440.

The Appellants offered several exhibits attempting to show Salem Grain's lost profits resulting from being denied the opportunity to purchase the stock from the sellers. Exhibit 103 lists annual profits and profits distributed to shareholders for the fiscal years ending July 31 from 2002 through 2009. Exhibit 104 lists the various shareholders after the sale to the Seebas; what their actual ownership in the corporation was as of November 2001 after the sale; and what their ownership would have been if Salem Grain had purchased the sellers' stock, canceled it, and placed it in Salem Grain's treasury. Exhibit 105 lists the profits that were distributed for each of the fiscal years between 2002 and 2009; the amounts actually received by Douglas, Carol, and one additional shareholder in each of those fiscal years; the amount they each would have received in each of those years had the sellers' shares been purchased by Salem Grain and canceled into treasury; and the difference between what was actually received and what would have been received for each individual for each year. The differences total $450,439.

We have set forth additional facts as necessary in the analysis section of this opinion.

The district court made certain oral findings on the record at the conclusion of the trial. On July 3, 2012, the district court entered its written judgment in favor of the Appellees. The court found that the Appellees did not breach any duties in the sale of their stock because they had the right to sell to another stockholder pursuant to the terms of the bylaws. The court also found that the corporation had no legal right to expect it could buy the stock being offered by the Appellees and that thus, as a matter of law, the corporation was not damaged by the sale of stock to other stockholders. On the other hand, the court found that the Appellees breached their fiduciary duty and their duty of loyalty to the corporation, directors, and shareholders by virtue of including corporate assets as consideration for the stock purchase agreement; by failing to

disclose the transaction; and by voting, as directors, to approve the bonuses and corporate distributions to effectuate the sale. However, the court found that the evidence did not support a finding of any damage or injury to the corporation as a result of that breach. Accordingly, the court dismissed the Appellants' first and second causes of action as a matter of law.

The district court also found that the Appellants did not submit sufficient evidence in support of their tortious interference claim. Additionally, the court found that there was no third-party interference in Salem Grain's expectancy, that Salem Grain had no expectancy, and that there was no unjustified intentional interference. The court dismissed the Appellants' third cause of action as a matter of law.

## III. ASSIGNMENTS OF ERROR

The Appellants assert, combined and restated, that the district court erred in (1) granting the Appellees' motion for a directed verdict, (2) finding that the Appellants did not prove damages, (3) finding that there was not sufficient evidence to support a cause of action for tortious interference with a business relationship, and (4) finding that the Appellants could not recover in their individual capacities on their tortious interference claim.

On cross-appeal, the Appellees assert that the district court erred when it held that the Appellants produced sufficient evidence to find that the Appellees breached their fiduciary duty and duty of loyalty to Salem Grain.

## IV. STANDARD OF REVIEW

In reviewing a trial court's ruling on a motion for directed verdict, an appellate court must treat the motion as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence. *Wulf v. Kunnath*, 285 Neb. 472, 827 N.W.2d 248 (2013). A directed verdict is proper only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law. *Lesiak v. Central Valley Ag Co-op*, 283 Neb. 103, 808 N.W.2d 67 (2012).

## V. ANALYSIS

### 1. DAMAGES

The Appellants assert that the district court erred in holding that they did not prove damages with regard to the first two causes of action. To succeed on a claim for breach of fiduciary duty, a plaintiff must prove that the defendant's breach of fiduciary duty caused the plaintiff damages and the extent of those damages. *McFadden Ranch v. McFadden*, 19 Neb. App. 366, 807 N.W.2d 785 (2001). Assuming, without deciding, that the Appellees breached their fiduciary duty and duty of loyalty to the Appellants, we conclude that the district court did not err in finding that the Appellants failed to prove damages as a matter of law.

The trier of fact may award only those damages which are the probable, direct, and proximate consequences of the wrong complained of. *Bedore v. Ranch Oil Co.*, 282 Neb. 553, 805 N.W.2d 68 (2011). A plaintiff's burden to prove the nature and amount of its damages

- 6 -

cannot be sustained by evidence which is speculative and conjectural. *Id.* A claim for lost profits must be supported by some financial data which permit an estimate of the actual loss to be made with reasonable certitude and exactness. *Id.*

The Appellants claim that they were damaged in two respects. First, they argue that the damages include the bonus of $27,500 paid to Salem Grain employees, the $62,400 commission paid to John, and the $176,916.50 distribution that was paid to all shareholders so they could pay their share of taxes incurred on the corporation's profits. Second, the Appellants assert damages of $450,439 in lost profits incurred between 2002 and 2009 as a result of "the improper underlying transaction." Brief for appellants at 12. They argue that this second category of damages involves profits Salem Grain, and particularly the Appellants, would have received had Salem Grain been allowed to buy the stock and retire it to its treasury.

With respect to the first category of damages, the district court found that Salem Grain's history showed that these bonuses were given annually to the manager as part of his salary and routinely to other employees. The court also determined that distributions were made annually by the directors to the shareholders to help pay the taxes on corporate profits in this subchapter S corporation. The Appellants argue that these findings by the court were speculative with respect to how the board of directors would have acted. However, the Appellants offered no evidence to support a conclusion that the directors would have voted differently had there been a full disclosure of the terms of the stock purchase at the November 2001 board meeting and absent the stock purchase agreement. Our review of the record shows that the board's action in awarding the bonuses, commission, and distributions at the November meeting was consistent with its past actions. The Appellants failed to prove that these payments were made solely as the probable, direct, and proximate consequence of the Appellees' breaches of fiduciary duty and duty of loyalty.

As to the second category of alleged damages, the Appellants argue that if Douglas, David, and John had succeeded in purchasing the stock, they would have offered it to Salem Grain and Salem Grain would have purchased and retired the stock. The only evidence in the record on this issue is Douglas' testimony that if they had succeeded in purchasing the stock, they would have then submitted the matter to the corporation for its consideration. There is no evidence to show that Salem Grain would have purchased the shares if offered them by Douglas' group and then retired the shares to treasury. The Appellants' evidence regarding lost profits was entirely speculative, and the district court did not err in finding that the corporation failed to adduce sufficient evidence of lost profits.

Because the Appellants have failed to sufficiently establish any damages resulting from the alleged breach of duty by the Appellees, we find no error in the grant of a directed verdict in favor of the Appellees.

## 2. TORTIOUS INTERFERENCE

### (a) Salem Grain

The Appellants first assert that the district court erred in holding that there was not sufficient evidence to support a cause of action for tortious interference with a business relationship.

To succeed on a claim for tortious interference with a business relationship or expectancy, a plaintiff must prove (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted. *Professional Mgmt. Midwest v. Lund Co.*, 284 Neb. 777, 826 N.W.2d 225 (2012).

In their brief, the Appellants argue that the district court erred in finding that there was no third-party interference with the corporation's expectancy, that there was no unjustified interference, and that the corporation had no expectancy. The Appellants argue that the corporation had a valid expectancy to purchase the stock, that the Appellees interfered with this expectancy by entering into secret negotiations with the Seebas and executing the 2001 stock purchase agreement, and that the corporation was damaged by losing "certain profits and business opportunities . . . that otherwise would have materialized had the Company been allowed to buy the stock and retire it to Treasury." Brief for appellants at 19.

However, in their third cause of action, titled "Individual Action - Tortuous [sic] Interference With a Business Relationship and Expectancy," the Appellants did not assert this cause of action on behalf of the corporation. Rather, the Appellants alleged, among other things, that in March 2001, they entered into an agreement whereby they and the Seebas would collectively negotiate and purchase the Appellees' shares of stock. They alleged further that they had a valid business expectancy in the agreement between themselves and the Seebas to purchase the stock, that the Appellees knew of this agreement and expectancy, that the Appellees intentionally and unjustifiably interfered with this "negotiation and purchase agreement," and that this interference was a proximate cause of damages to the Appellants because they have not "realized the monetary benefits associated with owning the stock" which was sold. Essentially, the Appellants alleged that they and the Seebas agreed to try to purchase the sellers' stock and that the Appellees interfered by selling the stock only to the Seebas. Nowhere in the operative complaint is there a derivative claim on behalf of the corporation for tortious interference.

Because the operative complaint does not contain a cause of action for tortious interference with a business relationship or expectancy on behalf of the corporation, we find no error in the district court's dismissal of this cause of action as to the corporation. Where the record adequately demonstrates that the decision of the trial court is correct, although such correctness is based on a ground or reason different from that assigned by the trial court, an appellate court will affirm. *Meis v. Houston*, 19 Neb. App. 504, 808 N.W.2d 897 (2012).

(b) Individual Appellants

The Appellants next argue that the district court erred in finding that they could not recover in their individual capacities on their tortious interference claim.

At the conclusion of the trial, the court orally discussed the Appellants' right to pursue this cause of action individually, but did not specifically make any finding that the Appellants had failed to adduce evidence to support allowing them to individually bring a direct action under *Trieweiler v. Sears*, 268 Neb. 952, 689 N.W.2d 807 (2004). In *Trieweiler v. Sears*, the Nebraska Supreme Court stated that the right of a shareholder to sue is derivative in nature and normally can be brought only in a representative capacity for the corporation. In legal effect, a

stockholders' derivative suit is one by the corporation conducted by the stockholder as its representative. *Id.* The stockholder is only a nominal plaintiff, the corporation being the real party in interest. *Id.* If the shareholder properly establishes an individual cause of action because the harm to the corporation also damaged the shareholder in his or her individual capacity, rather than as a shareholder, such individual action may be maintained. *Id.* It is only where the injury to the plaintiff's stock is peculiar to him or her alone, such as in an action based on a contract to which the shareholder is a party, or on a fraud affecting him or her directly, and does not fall alike upon other shareholders, that the shareholder may recover as an individual. *Id.*

The district court's written order in this case also did not contain any specific findings regarding the Appellants' right to pursue this cause of action individually as opposed to derivatively; rather, the court merely indicated that there was insufficient evidence to support this cause of action. Assuming, without deciding, that the Appellants established their right to bring an individual action for tortious interference with a business relationship or expectancy, we conclude that the court nevertheless was correct in directing a verdict on this cause of action in favor of the Appellees.

The record shows that after the sellers made their first offer of the stock, John, David, and Douglas made a counteroffer in March 2001 for $450,000 to which the sellers did not respond. Douglas testified that they made the counteroffer with the knowledge that the sellers were seeking offers from outside parties. In July, Douglas inquired about the status of the counteroffer, was informed that it was too low, and was encouraged to make a more realistic offer. Later in the month, John, David, and Douglas offered to buy the sellers' shares for $550,000. The sellers countered, offering to sell the shares for $950,000. No response was made by John, David, and Douglas to this counteroffer. Duey thereafter contacted John and encouraged him to make another offer with David and Douglas. No further offers were made by John, David, and Douglas. Eventually, the Seebas offered to purchase the shares separately and did so.

Resolving controverted facts in the Appellants' favor and giving them the benefit of every inference which can reasonably be deduced from the evidence, we agree with the district court that the Appellants did not adduce sufficient evidence to show that the Appellees tortiously interfered with any business relationship or expectancy. Although the evidence shows that John, David, and Douglas collectively negotiated with the sellers for a period of time, there is nothing in the record to establish that these three stockholders had an agreement to pursue the purchase of the stock only collectively as opposed to individually. Likewise, there is no evidence that had such an agreement existed between the three stockholders, the Appellees were aware of such agreement. The sellers, including the Appellees, were under no obligation to sell the stock to the Appellants and John collectively, but were obligated under the bylaws to offer the stock to only another existing stockholder, which is what occurred. Finally, the evidence does not support a conclusion that, but for the Appellees' separate negotiations with the Seebas that led to the stock purchase agreement, the Appellants and the Seebas would have succeeded in purchasing the sellers' stock together. The district court did not err in finding there was insufficient evidence to support the Appellants' tortious interference claim.

### 3. Breach of Fiduciary Duty and Duty of Loyalty

On cross-appeal, the Appellees assert that the district court erred when it held that the Appellants produced sufficient evidence to find that the Appellees breached their fiduciary duty and duty of loyalty to Salem Grain.

Because we have concluded that the directed verdict in favor of the Appellees was not in error, we need not address the question of whether the Appellees breached any duty owed to the corporation. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *Holdsworth v. Greenwood Farmers Co-op*, 286 Neb. 49, 835 N.W.2d 30 (2013).

## VI. CONCLUSION

Because we find no error in the grant of a directed verdict in favor of the Appellees, we affirm.

AFFIRMED.